# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 16, 2022

Lyle W. Cayce
Clerk

---

No. 20-30382

---

Stephen Douglass, Individually and as personal representative of the Estate of Shingo Alexander Douglass; Dora Hernandez, Individually and as personal representative of the Estate of Noe Hernandez; Lan Huynh, Individually and as personal representative of the Estate of Ngoc Truong Huynh; Darrold Martin, Individually and as personal representative of the Estate of Xavier Alec Martin; Erin Rehm, Individually and as personal representative of the Estate of Gary Leo Rehm, Jr.; Lloyd Wayne Rigsby, Jr., Individually and as personal representative of the Estate of Dakota Kyle Rigsby; Carmen Sibayan, Individually and as personal representative of the Estate of Carlos Victor Ganzon Sibayan,

*Plaintiffs—Appellants*,

*versus*

Nippon Yusen Kabushiki Kaisha,

*Defendant—Appellee*,

consolidated with

---

No. 20-30379

---

No. 20-30382
c/w No. 20-30379

JHON ALCIDE; RICHARD ALLEN-EASMON; DUSTIN ANGLE;
JESUS ARGUELLO; VALERIE ARGUELLO, ET AL

*Plaintiffs—Appellants,*

*versus*

NIPPON YUSEN KABUSHIKI KAISHA,

*Defendant—Appellee.*

---

Appeals from the United States District Court
for the Eastern District of Louisiana
USDC Nos. 2:19-CV-13688 & 2:19-CV-13691

---

ON PETITION FOR REHEARING EN BANC

Before RICHMAN, *Chief Judge*, and JONES, SMITH, STEWART, DENNIS, ELROD, SOUTHWICK, HAYNES, GRAVES, HIGGINSON, COSTA, WILLETT, HO, DUNCAN, ENGELHARDT, OLDHAM, and WILSON, *Circuit Judges*.

EDITH H. JONES, *Circuit Judge*, joined by RICHMAN, *Chief Judge*, and SMITH, STEWART, DENNIS, SOUTHWICK, HAYNES, COSTA, HO, DUNCAN, ENGELHARDT, and WILSON, *Circuit Judges*:[*]

The issue before the en banc court is whether a federal court may exercise personal jurisdiction over a foreign corporation for federal claims, which arise from injuries and deaths of American naval personnel in a collision in foreign waters. To succeed, the plaintiffs must show either that

---

[*] Judge Haynes concurs in the judgment only. Senior Judge King was a member of the panel but chose not to participate in en banc rehearing.

No. 20-30382
c/w No. 20-30379

the foreign corporation is "at home" in the United States or that their claims arise from or relate to the foreign corporation's business activities in the United States. The district court rejected the first alternative based on substantial precedent; the plaintiffs foreswore, as they had to, reliance on the second alternative. We AFFIRM.

## I. Background

Nippon Yusen Kabushiki Kaisha ("NYK"), incorporated and headquartered in Japan, is a major global logistics company that transports cargo by air and sea. For its seaside operations, NYK owns or charters a formidable fleet that includes bulk carriers, container ships (of all sizes), car transporters, tankers, cruise ships, shuttle tankers, drillships, and LNG carriers, among other vessels.[1] NYK charters more than half of the ships it uses to transport cargo.[2] The vessels call port throughout the world. Between 2017 and 2019, about seven percent of the worldwide port calls made by NYK owned or chartered vessels were in the United States, totaling about 1500 calls annually.

A natural consequence of NYK's handling shipments bound for the United States is that it occasionally litigates in American courts. Since 2010, for example, NYK has filed around thirty lawsuits in federal courts, most involving claims seeking freight charges owed under bills of lading.[3] And

---

[1] NYK Group Fleet, NYK LINE FACT BOOK I 2019, at 8 (Apr. 26, 2019), https://www.nyk.com/english/ir/library/fact/first/2019/__icsFiles/afieldfile/2019/10/28/190426FB1E_1.pdf (last visited Oct. 23, 2021).

[2] *Id.*

[3] *See, e.g.*, Complaint at 3-5, *Nippon Yusen Kabushiki Kaisha v. GSF Nut Co., LLC*, No. 2:2017-cv-5614 (C.D. Cal. July 28, 2017), ECF No. 1; Complaint at 5-8, *Nippon Yusen Kabushiki Kaisha v. Multi-Trans Shipping Agency, Inc.*, No. 2:2016-cv-9523 (C.D. Cal. Dec. 23, 2016), ECF No. 1; Complaint at 3-5, *Nippon Yusen Kabushiki Kaisha v. Wesmex Inc.*, No. 8:2014-cv-1910 (C.D. Cal. Dec. 3, 2014), ECF No. 1.

No. 20-30382
c/w No. 20-30379

every so often, NYK and its ships are sued in American courts, typically for cargo damaged en route to the United States or for injuries that occurred during cargo operations in the United States.[4]

Among NYK's approximately 1700 employees, about 25 are seconded to NYK subsidiaries in the United States. Overall, NYK's business in the United States and North America makes up less than ten percent of its annual revenue.

On June 17, 2017, the *ACX Crystal*, a 730-foot container ship chartered by NYK,[5] collided with the destroyer *USS Fitzgerald* in Japanese

---

[4] *See, e.g.*, Complaint at 1-5, *Epperson v. NYK Line*, No. 4:2019-cv-5948 (N.D. Cal. Sept. 24, 2019), ECF No. 1 (negligence claim by American harbor pilot injured in United States waters by allegedly faulty Jacob's ladder); Complaint at 3-5, *Neal v. NYK Line*, No. 4:2013-cv-507 (N.D. Cal. Feb. 5, 2013), ECF No. 1 (negligence claim by longshoreman involved in unloading NYK vessel in the United States); Complaint at 2-3, *Starr Indem. & Liab. Co. v. Yamato Transp. U.S.A., Inc.*, No. 2:2016-cv-4616 (C.D. Cal. June 24, 2016), ECF No. 1 (damaged cargo); Complaint at 2-4, *Great Am. Ins. Co. of N.Y. v. Hanjin Shipping*, No. 2:2015-cv-8798 (C.D. Cal. Nov. 11, 2015), ECF No. 1 (same); Complaint at 2-4, *Beachside Produce, LLC v. Nippon Yusen Kabushiki Kaisha*, No. 2:2015-cv-4951 (C.D. Cal. June 30, 2015), ECF No. 1 (same).

[5] NYK had a time charter for the *ACX Crystal*. A time charterer obtains use of a ship in only a limited sense: The vessel's owner "provides the vessel's master and crew and (depending on the circumstances) pays the normal operating expenses, while the charterer obtains the commercial benefit of having its cargo carried." David W. Robertson, Steven F. Friedell, & Michael F. Sturley, Admiralty and Maritime Law in the United States 325 (4th ed. 2020). In other words, time charters "are more like taxis or limousine services or hotels than they are like typical leases." *Id.* Because the time charterer typically has little or no control over the vessel's navigation, it almost never bears liability for a collision stemming from navigational error. *See Moore v. Phillips Petroleum Co.*, 912 F.2d 789, 792 (5th Cir. 1990) ("The vessel owner remains responsible for . . . navigational errors by the pilot and negligence by the crew . . . .") (citation omitted). Thus, even if the plaintiffs could establish personal jurisdiction over NYK, their claims face other substantial hurdles.

4

No. 20-30382
c/w No. 20-30379

territorial waters.[6] As the *ACX Crystal*'s bow ripped through the *Fitzgerald*'s hull at midship, several compartments on the *Fitzgerald* flooded, killing seven American sailors and injuring dozens of others. At the time of the collision, the *ACX Crystal*, then a Philippine-flagged vessel, was on an intra-Asia trade route. It has never called port in the United States.

Personal representatives of the seven sailors killed sued NYK in federal court, asserting wrongful death and survival claims under the Death on the High Seas Act, 46 U.S.C. § 30301 *et seq*. The injured sailors and their family members sued NYK separately, asserting negligence and loss of consortium claims.[7] In both cases, the plaintiffs alleged that NYK, a foreign corporation, is amenable to federal court jurisdiction under FED. R. CIV. P. 4(k)(2) based on its "substantial, systematic and continuous contacts with the United States as a whole." Neither complaint alleges that the injuries at issue arose out of or relate to NYK's contacts with the United States.

NYK moved to dismiss the suits for lack of personal jurisdiction under FED. R. CIV. P. 12(b)(2). The district court obliged, issuing identical opinions. Relying on *Patterson v. Aker Solutions Inc.*, 826 F.3d 231 (5th Cir. 2016), the district court held that the Fifth Amendment due process test for

---

[6] The after-accident reports issued by the National Transportation Safety Board and the Japanese Transport Safety Board largely fault the United States Navy for the collision—neither report places any fault on NYK. *See* National Transportation Safety Board, *Marine Accident Report: Collision Between US Navy Destroyer* Fitzgerald *and Philippine-Fleg Container Ship* ACX Crystal *Sagami Nada Bay off Izu Peninsula, Honshu Island, Japan July 17, 2017* (2020), https://www.ntsb.gov/investigations-/AccidentReports/Reports/MAR 2002.pdf (last visited Oct. 23, 2021); Japan Transport Safety Board, *Marine Accident Investigation Report* (Aug. 29, 2019), https://www. mlit.go.jp/jtsb/eng-mar_report/2019 /2017tk0009e.pdf (last visited Oct. 23, 2021).

[7] The injured sailors and the personal representatives of the sailors killed also sued the *ACX Crystal*'s owner, Olympic Steamship Company, and its bareboat charterer, Vega Carriers Corporation, both Panamanian corporations, in Japan for the same injuries at issue in this lawsuit. *See* Appellee's Rule 28(j) Letter dated Jan. 29, 2021.

personal jurisdiction governs this admiralty dispute and mirrors the Fourteenth Amendment test. Applying the Fourteenth Amendment standard, the district court concluded that NYK did not have sufficient contacts with the United States to justify the court's exercising personal jurisdiction over it.

On appeal, the cases were consolidated. The panel affirmed the judgment but suggested it would have reached a different result if not bound by *Patterson*. Concurring, Judges Elrod and Willett opined that "our interpretation of Fourteenth Amendment due process is shaped by federalism concerns that are irrelevant to the Fifth Amendment context," and *Patterson* imposed an "unnecessary limitation" on Rule 4(k)(2). In their view, *Patterson* "unwittingly limited Rule 4(k)(2) by collapsing the Fifth Amendment and Fourteenth Amendment due process analyses."

This court granted plaintiffs' petition for rehearing en banc to consider whether NYK is subject to jurisdiction in these cases.

## II. Standard of Review

This court's review of a Rule 12(b)(2) dismissal for lack of personal jurisdiction is de novo. *Patterson*, 826 F.3d at 233 (citing *Revell v. Lidov*, 317 F.3d 467, 469 (5th Cir. 2002)).

## III. Discussion

The Fifth Amendment due process standard governs the personal jurisdiction inquiry in this lawsuit raising federal claims in federal court. The en banc dispute centers on whether the Fifth Amendment standard mirrors the "minimum contacts" and "fair play and substantial justice" principles underlying the Fourteenth Amendment personal jurisdiction inquiry. Two issues, considered in turn, logically precede that debate. First, we reject the plaintiffs' passing argument that NYK, as a foreign corporation, lacks Fifth

No. 20-30382
c/w No. 20-30379

Amendment due process rights altogether and therefore cannot object to a federal court's assertion of personal jurisdiction over it. Second, we expose the faulty premise underlying the plaintiffs' contention that applying Fourteenth Amendment personal jurisdiction standards in Fifth Amendment cases would render Rule 4(k)(2) a nullity.[8]

**A. Foreign corporations litigating in federal court may challenge the court's personal jurisdiction under the Fifth Amendment Due Process Clause.**

The plaintiffs oddly contend that NYK, as a foreign corporation, has no Fifth Amendment due process rights at all. In support, they cite cases addressing whether constitutional rights extend to foreign persons acting

---

[8] This majority opinion addresses the exact arguments raised by the plaintiffs consistently throughout the litigation. But for one point, we will not address the dissents' wholly novel arguments, which pointedly divorce themselves from the parties' theory of the case. *Post* at 47 n.5 ("I disagree with both approaches because both start not with the Fifth Amendment but with inapplicable Fourteenth Amendment case law."). By standing up for the law as it has been accepted unanimously among the circuit courts, we decline to consider adversarially untested propositions. Moreover, the principal dissent's criticism that NYK bore some burden—to anticipate and analyze personal jurisdiction without any reference to well-settled case law—is simply wrong. At the very least, it is the plaintiffs' burden to establish the court's jurisdiction in response to a Rule 12(b)(2) personal jurisdiction challenge by a defendant. *Johnson v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008).

If we were to address the merits of the principal dissent's theory, however, we would note its repeated insistence that, consistent with the Fifth Amendment, *Congress* could pass a law to subject foreign defendants to American federal court jurisdiction for any injuries inflicted on American citizens or claims arising abroad. Whether this is correct or not, we do not assay. Moreover, we cannot analyze this theory because the dissent posits no rule or limits flowing from the Fifth Amendment. And finally, no court has adopted the dissent's view that Rule 4(k)(2) alone suffices to extend substantive personal jurisdiction to the constitutional limit, and the Rule's language alone suggests otherwise. FED. R. CIV. P. 4(k)(2) ("[S]erving a summons . . . establishes personal jurisdiction over a defendant if . . . exercising jurisdiction is consistent with the United States Constitution and laws.").

abroad. *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 140 S. Ct. 2082, 2088 (2020) (holding that foreign subsidiaries of United States companies do not have First Amendment rights); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 274-75, 110 S. Ct. 1056, 1065-66 (1990) (rejecting contention that DEA's search of a residence in Mexico violated non-citizen's Fourth Amendment rights).[9] Here, however, NYK invokes its constitutional due process rights in the course of litigation *in the United States*. Therefore, any constitutional violation can occur only in the United States. *Cf. Verdugo-Urquidez*, 494 U.S. at 264, 110 S. Ct. at 1060 (differentiating Fifth and Fourth Amendment violations and concluding that unlike an "unreasonable search and seizure," a violation of the privilege against self-incrimination "occurs only at trial"). The cases the plaintiffs rely on are thus inapposite.

Further, the plaintiffs' argument is irreconcilable with the countless cases where courts, including the Supreme Court, have afforded foreign corporations due-process-based personal-jurisdiction protections under the Fourteenth Amendment. *See, e.g.*, *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 131 S. Ct. 2846 (2011); *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 131 S. Ct. 2780 (2011); *Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102, 107 S. Ct. 1026 (1987). Thus, NYK can object to a federal court's unwarranted exercise of personal jurisdiction to the same extent as a United States citizen.

---

[9] The plaintiffs also rely on *Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1981-83 (2020), to support their claim. That case, however, is inapt here because it addresses whether non-naturalized foreigners have due process rights to judicial review of immigration decisions where Congress did not statutorily provide such review. *Id.*

No. 20-30382
c/w No. 20-30379

**B. Rule 4(k) is a procedural rule governing the territorial limits of service.**

Federal Rule of Civil Procedure 4(k)(2) states that, "[f]or a claim that arises under federal law, serving a summons . . . establishes personal jurisdiction over a defendant if:   (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws."

Throughout their briefing, the plaintiffs present Rule 4(k)(2) as the substantive source of personal jurisdiction over NYK and contend that adopting the Fourteenth Amendment standard would render Rule 4(k)(2) a nullity.   That rule-centric view obscures the purely constitutional nature of the personal jurisdiction question at issue here.   Rule 4(k)(2) is a procedural rule governing the territorial limits of service.   The text is expressly subservient to the constitutional limits of due process.   The rule does not— and cannot—control the constitutional inquiry whether due process prohibits a court from exercising personal jurisdiction over the defendant in a given lawsuit.

Today, personal jurisdiction is typically exercised through a summons to appear in court on pain of default.   The valid exercise of jurisdiction through a summons requires (1) notice of the command and (2) amenability to the command.   The notice requirement is procedural, and the amenability requirement is substantive.   Historically, those requirements were inextricably intertwined because federal courts had jurisdiction over only defendants that voluntarily appeared or were personally served in the district.[10]   At the advent of the Federal Rules of Civil Procedure, the

---

[10] Judiciary Act of 1789, ch. 20, § 11, 1 Stat. 73, 79 ("But no person shall be arrested in one district for trial in another, in any civil action before a circuit or district court. . . . And no civil suit shall be brought before either of said courts against an inhabitant of the

No. 20-30382
c/w No. 20-30379

procedural limitations on proper notice were basically the same.[11] *See* Fed. R. Civ. P. 4(f) (1938).

In 1945, however, the Supreme Court made clear that due process permitted personal jurisdiction over a nonresident defendant as long as the defendant had "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S. Ct. 339, 343 (1940)). After *International Shoe*, states began authorizing out-of-state service.[12] Rule 4 was amended in 1963 to allow service outside the territorial limits of the state when authorized by state law.[13] As the territorial scope of service expanded, the due process limitations on personal jurisdiction assumed greater independent significance. *See, e.g.*, *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S. Ct. 2174 (1985); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 104 S. Ct. 1868 (1984); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S. Ct. 559 (1980); *Kulko v. Superior Ct. of Cal.*, 436 U.S. 84, 98 S. Ct. 1690 (1978).

---

United States, by any original process in any other district than that whereof he is an inhabitant, or in which he shall be found at the time of serving the writ . . . .").

[11] Fed. R. Civ. P. 4(f) advisory committee's note (1937) ("This Rule enlarges to some extent the present rule as to where service may be made. It does not, however, enlarge the jurisdiction of the district courts.").

[12] Douglas D. McFarland, *Dictum Run Wild: How Long-Arm Statutes Extended to the Limits of Due Process*, 84 B.U. L. Rev. 491, 492-97 (2004) (discussing the rise of state long-arm statutes after *International Shoe*).

[13] Fed. R. Civ. P. 4(f) advisory committee's note (1963) ("The first sentence is amended to assure the effectiveness of service outside the territorial limits of the State in all the cases in which any of the rules authorize service beyond those boundaries.").

No. 20-30382
c/w No. 20-30379

Then came the 1993 Amendments. Rule 4 was completely rewritten and what was Rule 4(f) became Rule 4(k). Relevant here, the new Rule 4(k)(2), adopted in response to the Supreme Court's decision in *Omni Capital Int'l v. Rudolf Wolff & Co.*, 484 U.S. 97, 108 S. Ct. 404 (1987), assumed its current wording, although Rule 4(k) retained the old Rule 4(f)'s caption, "Territorial Limits of Effective Service." FED. R. CIV. P. 4(k).

Notwithstanding the amendments, Rule 4(k) is still just a procedural rule about issuing summonses. By law, the Federal Rules of Civil Procedure cannot "abridge, enlarge or modify any substantive right," 28 U.S.C. § 2072(b), and a rule expanding the scope of a court's personal jurisdiction would modify a substantive right no less than a rule expanding subject matter jurisdiction. Further, the Advisory Committee that recommended the 1993 Amendments recognized that "[t]here remain constitutional limitations on the exercise of territorial jurisdiction by federal courts over persons outside the United States." FED. R. CIV. P. 4(k)(2) advisory committee's note to 1993 amendment. No doubt service of a summons under Rule 4(k)(2) establishes personal jurisdiction when procedurally authorized by the Federal Rules and consistent with the Constitution. But as the rule expresses, the efficacy of service remains subject to the constitutional question whether a defendant is amenable to jurisdiction. The plaintiffs' consequentialist argument, that adopting a certain due process test for personal jurisdiction under the Fifth Amendment would render Rule 4(k)(2) a nullity, is textually and logically unsound.

**C. The Fifth Amendment due process test for personal jurisdiction mirrors the Fourteenth Amendment test.**

This brings us to the heart of the dispute: Determining what standard governs personal jurisdiction over defendants sued on federal claims in federal court under the Fifth Amendment Due Process Clause.

11

NYK contends that the Fifth Amendment due process test for personal jurisdiction parallels the Fourteenth Amendment test, except that the Fifth Amendment test looks at contacts with the United States as a whole rather than any one state. On this basis, NYK continues, the tried and true dichotomy between specific and general jurisdiction applies under the Fifth Amendment. Because the plaintiffs do not allege that their claims arise out of or relate to NYK's contacts with the United States, NYK is amenable to the district court's jurisdiction only under a general jurisdiction theory, which means NYK is amenable to jurisdiction if and only if its contacts are "so continuous and systematic as to render it essentially at home in the" relevant forum, the United States. *Daimler AG v. Bauman*, 571 U.S. 117, 139, 134 S. Ct. 746, 761 (2014) (quoting *Goodyear*, 564 U.S. at 920, 131 S. Ct. at 2851) (cleaned up).

The plaintiffs and their amici[14] key off their interpretation of Rule 4(k)(2) and contend that the Fifth and Fourteenth Amendment due process requirements are critically different. They note first that the Supreme Court has expounded on the Fourteenth Amendment due process requirements for personal jurisdiction but has consistently reserved the Fifth Amendment question. Additionally, while principles of interstate federalism and individual liberty animate the Supreme Court's Fourteenth Amendment personal jurisdiction jurisprudence, the Fifth Amendment focuses on the United States' sovereign limits rather than the states' reciprocal sovereign limits, rendering federalism immaterial. Because the Fifth Amendment is concerned with guaranteeing fairness for defendants rather than circumscribing state court jurisdiction, a distinct and more permissive standard is warranted. What is more, importing the Fourteenth Amendment

---

[14] Professors Helen Hershkoff, Arthur R. Miller, Alan B. Morrison, John E. Sexton, and Adam N. Steinman filed an *amicus curiae* brief in this case supporting the plaintiffs.

No. 20-30382
c/w No. 20-30379

standards into the Fifth Amendment analysis would render Rule 4(k)(2) essentially nugatory. Finally, at a minimum, admiralty's unique nature and history necessitate a distinct standard.

In the plaintiffs' view, the Fifth Amendment due process inquiry is simply whether a defendant, sued on a federal claim, was doing enough systematic and continuous business in the United States that it had fair notice it could be subjected to suit in federal courts. Their novel theory eschews the traditional distinction between general and specific personal jurisdiction and, more specifically, advocates against applying recent Supreme Court general jurisdiction cases like *Daimler* in favor of a barebones "continuous and systematic" standard articulated in *International Shoe* and allegedly applied heretofore in this court.

In Fourteenth Amendment vernacular, the plaintiffs' proposed personal jurisdiction test appears to dress a general jurisdiction theory in specific jurisdiction garb. But even if they argued that their claims must in some way be related to the foreign defendant's continuous and systematic contacts with the United States, the "related" prong of their proposed Fifth Amendment personal jurisdiction test is toothless: If personal injury and wrongful death claims caused in foreign waters by a foreign logistics company's chartered, foreign-registered vessel bound for a foreign country are sufficiently related to that corporation's shipping-related contacts with the United States, then what isn't? The plaintiffs' conception of "related" goes far beyond the Fourteenth Amendment's "arise out of or relate to" standard.

We reject the plaintiffs' theory and hold that the Fifth Amendment due process test for personal jurisdiction requires the same "minimum contacts" with the United States as the Fourteenth Amendment requires with a state. Both Due Process Clauses use the same language and serve the

13

same purpose, protecting individual liberty by guaranteeing limits on personal jurisdiction. Every court that has considered this point agrees that the standards mirror each other. The plaintiffs' rule-centric argument, that importing the Fourteenth Amendment standards into the Fifth Amendment context renders Rule 4(k)(2) a nullity, is unpersuasive and wrong. Finally, the plaintiffs misinterpret the law underlying their argument about admiralty law's unique nature and history regarding jurisdiction over foreign defendants.

### 1. The Due Process Clauses.

Limits on the scope of a court's personal jurisdiction "flow[] not from Art. III, but from the Due Process Clause." *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702, 102 S. Ct. 2099, 2104 (1982). Both Due Process Clauses protect persons from the deprivation of "life, liberty, or property, without due process of law." U.S. Const. amend. V; amend. XIV, § 1. The clauses differ only in that the Fifth Amendment Due Process Clause limits the federal government, while the Fourteenth Amendment Due Process Clause limits the states. Based on that dissimilarity, the plaintiffs contend that the Fourteenth Amendment Due Process Clause vindicates federalism principles that are irrelevant under the Fifth Amendment. No doubt federalism is immaterial under the Fifth Amendment, but the plaintiffs' myopic emphasis on federalism misses the very core of due process.

"Due process of law" traces its origins to the Great Charter of individual liberty, Magna Carta.[15] Individual liberty is what the Supreme

---

[15] Magna Carta guaranteed that "[n]o free man shall be taken, imprisoned, disseised, outlawed, banished, or in any way destroyed, nor will We proceed against or prosecute him, except by the lawful judgment of his peers and by the law of the land." A.E. Dick Howard, Magna Carta Text and Commentary 45 (rev. ed. 1998). At

No. 20-30382
c/w No. 20-30379

Court emphasizes as the foundation of the personal jurisdiction requirement. That requirement "represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty." *Ins. Corp. of Ir.*, 456 U.S. at 702, 102 S. Ct. at 2104; *see also Nicastro*, 564 U.S. at 899-900, 131 S. Ct. at 2798 (Ginsburg, J., dissenting) (citing *Ins. Corp. of Ir.*, 456 U.S. at 703 n.10, 102 S. Ct. at 2104 n.10); *Burger King*, 471 U.S. at 471-72, 105 S. Ct. at 2181-82. *International Shoe*'s minimum contacts test secures defendants' individual liberty by protecting them against (1) the concrete burden of "litigating in a distant or inconvenient forum," *World-Wide Volkswagen*, 444 U.S. at 292, 100 S. Ct. at 564, and (2) the abstract burden of "submitting to the coercive power of a [forum] that may have little legitimate interest in the claims in question." *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 137 S. Ct. 1773, 1781 (2017). A forum's "interest" in the litigation depends on, *inter alia*, the relationship among the defendant, the forum, and the litigation.

To be sure, federalism concerns are central to the Supreme Court's interpretation of the Fourteenth Amendment Due Process Clause.[16] But "federalism" is a proxy for the abstract burden of a defendant's submitting to the coercive power of a forum with little interest in the dispute. In *Insurance Corp. of Ireland*, the Supreme Court explained that the "restriction on state sovereign power described in *World-Wide Volkswagen*," i.e., the "federalism" aspect of Fourteenth Amendment due process, "must be seen

---

the time of the Fifth Amendment's ratification, people universally understood "due process of law" to convey "the same meaning as the words 'by the law of the land'" in Magna Carta. *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 276 (1856).

[16] *See, e.g. Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. ---, 141 S. Ct. 1017, 1025, 1030 (2021); *Bristol-Myers Squibb*, 137 S. Ct. at 1780-81, 1788; *World-Wide Volkswagen*, 444 U.S. at 293-94, 100 S. Ct. at 565-66.

15

No. 20-30382
c/w No. 20-30379

as ultimately a function of the individual liberty interest preserved by the Due Process Clause." 456 U.S. at 702 n.10, 102 S. Ct. at 2104 n.10. Indeed, "if the federalism concept operated as an independent restriction on the sovereign power of the court, it would not be possible to waive the personal jurisdiction requirement"—an individual's "actions cannot change the powers of sovereignty, although the individual can subject himself to powers from which he may otherwise be protected." *Id.* In short, "federalism" is not the quintessence of the personal jurisdiction analysis under the Fourteenth Amendment Due Process Clause, it is a derivative concern.

Further, an analogous "federalism" dynamic may arise in the Fifth Amendment context under the rubric of "international comity."[17] Just as a state court's exercising coercive power over an out-of-state defendant offends Fourteenth Amendment due process when the relationship among the defendant, the state, and the litigation is insufficient, so, too, may a federal court's exercising coercive power over a foreign non-resident defendant offend Fifth Amendment due process when the relationship among the defendant, the United States, and the litigation is insufficient. Either situation potentially infringes individual liberty, though the impact of foreign relations and national security surely can affect the United States' "sovereign reach" in ways irrelevant to this case.

---

[17] Consider, for instance, the international comity concerns implicated in this case. Under the plaintiffs' theory, virtually every foreign corporation with more than a nominal amount of business in the United States can be haled into federal court for any federal claim. Such a reading of the Due Process Clause would not "give[] a degree of predictability to the legal system" that would allow corporations to reasonably "structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *World-Wide Volkswagen*, 444 U.S. at 297, 100 S. Ct. at 567. Even if NYK were ultimately held amenable to federal court jurisdiction here, the same international comity concerns may warrant forum non conveniens dismissal—especially because concurrent litigation is pending in Japanese Courts.

16

No. 20-30382
c/w No. 20-30379

In any event, the plaintiffs' focus on "federalism" concerns in the Supreme Court's Fourteenth Amendment jurisprudence is beside the point. Federalism concerns are germane to *specific* jurisdiction—not general jurisdiction, which is the only theory the plaintiffs advanced in the district court.[18] "Federalism" cannot matter for general jurisdiction. If a corporate defendant is "at home" in the forum, by incorporation, principal place of business, or otherwise, that forum has "complete and irresistible" jurisdiction over it. J. Story, Commentaries on the Conflict of Laws 911-12, (3d ed. 1846); *see also Daimler*, 571 U.S. at 127, 134 S. Ct. at 754; *Goodyear*, 564 U.S. at 919, 131 S. Ct. at 2851; *Helicopteros*, 466 U.S. at 414 n.9, 104 S. Ct. at 1872 n.9. Plaintiffs' proffered "federalism" differences between the Fifth and Fourteenth Amendments are superfluous.

Because the Due Process Clauses use the same language and guarantee individual liberty in the same way, it makes sense that the standards developed in the Fourteenth Amendment context must govern under the Fifth Amendment.

> *2. Courts all apply the Fourteenth Amendment "minimum contacts" standard in Fifth Amendment cases.*

This court and six other circuits apply Fourteenth Amendment due process analysis to determine personal jurisdiction in cases governed by the Fifth Amendment.

---

[18] *Compare Ford Motor Co.*, 141 S. Ct. at 1025, 1030 (raising "federalism" concerns in specific personal jurisdiction case) and *Bristol-Myers Squibb*, 137 S. Ct. at 1780-81, 1788 (same) and *World-Wide Volkswagen*, 444 U.S. at 293-94, 100 S. Ct. at 565-66 (same) *with Daimler*, 571 U.S. 117, 134 S. Ct. 746 (failing to raise "federalism" concerns in general personal jurisdiction case); *Goodyear*, 564 U.S. 915, 131 S. Ct. 2846 (same); *Helicopteros*, 466 U.S. 407, 104 S. Ct. 1868 (1984) (same). *But see Daimler*, 571 U.S. at 157, 134 S. Ct. at 772 (Sotomayor, J., concurring in the judgment).

No. 20-30382
c/w No. 20-30379

Every Fifth Circuit decision addressing the scope of contacts required for personal jurisdiction under the Fifth Amendment has applied the then-existing Fourteenth Amendment framework.[19]  Relatedly, this court's Rule 4(k)(2) cases consistently recognize and invoke the general-specific jurisdiction dichotomy, which the plaintiffs dismiss as irrelevant to the Fifth Amendment.[20]  Paradigmatically, in *Patterson*, the court considered whether general jurisdiction existed over a foreign defendant on a federal claim based on its contacts with the United States as a whole.  *Patterson*, 826 F.3d at 234. In finding insufficient contacts with the United States to support general jurisdiction, the court squarely relied on a then-recent Supreme Court decision founded on the Fourteenth Amendment.  *Id.* (citing *Daimler*, 571 U.S. 139, 134 S. Ct. at 761).

In practice, this court has found that a foreign corporation's contacts satisfy Fifth Amendment due process only in cases where the parties' dispute arose out of or related to those United States contacts, that is, where specific jurisdiction existed.[21]  The Fifth Circuit has never found that a foreign

---

[19] *See, e.g.*, *Patterson*, 826 F.3d at 234 (relying on Fourteenth Amendment cases); *Quick Techs., Inc. v. Sage Grp. PLC*, 313 F.3d 338, 343-45 (5th Cir. 2002) (same); *Adams v. Unione Mediterranea di Sicurta*, 364 F.3d 646, 651-52 (5th Cir. 2004) (same).

[20] *See, e.g.*, *Stutzman v. Rainbow Yacht Adventures Ltd.*, 265 F. App'x 402 (5th Cir. 2008) (per curiam); *Quick Techs.*, 313 F.3d at 343-45; *Submersible Sys., Inc. v. Perforadora Cent., S.A. de C.V.*, 249 F.3d 413, 420 (5th Cir. 2001).

[21] *See Nagravision SA v. Gotech Int'l Tech. Ltd.*, 882 F.3d 494 (5th Cir. 2018) (approving personal jurisdiction over foreign defendants where plaintiffs alleged that defendants "use a network of servers located in various cities across . . . the United States to engage in the unauthorized distribution of Nagravision's control words in violation of the DMCA and FCA"); *Adams*, 364 F.3d at 651-652 (finding sufficient contacts for personal jurisdiction where foreign defendant insured steel shipment to United States and "enabled prosecution of claims in the United States by providing claims agents and surveyors" in United States).

18

No. 20-30382
c/w No. 20-30379

corporation's contacts with the United States alone supported general jurisdiction over unrelated lawsuits.[22]

The plaintiffs' reliance on *Adams v. Unione Mediterranea di Scurta*, 364 F.3d 646 (5th Cir. 2004) is misplaced. This court determined that the defendant, an Italian insurer, had "continuous and systematic contacts with the United States as a whole." *Id.* at 651-52. But the claims stemmed from a cargo insurance policy covering a shipment to the United States. *Id.* at 648. *Adams* represents a straightforward application of *International Shoe*'s specific jurisdiction principles.[23] *See Int'l Shoe*, 326 U.S. at 317, 66 S. Ct. at

---

[22] *See, e.g.*, *De Leon v. Shih Wei Navigation Co.*, 269 F. App'x 487, 490-91 (5th Cir. 2008) (per curiam) (rejecting general personal jurisdiction theory); *Stutzman*, 265 F. App'x at 403-04 (same); *Submersible Sys.*, 249 F.3d at 420-21.

Indeed, our research found no case accepting a general personal jurisdiction theory under the Fifth Amendment like what plaintiffs propose here. *See, e.g.*, *Doe v. Buratai*, 792 F. App'x 6, 9 (D.C. Cir. 2019) (per curiam); *Morris ex rel. Or. Cascade Corp. v. Harley*, 720 F. App'x 326, 329 (9th Cir. 2017) (per curiam); *Wolf v. Celebrity Cruises, Inc.*, 683 F. App'x 786, 793 (11th Cir. 2017) (per curiam); *Schulman v. Inst. for Shipboard Educ.*, 624 F. App'x 1002, 1006 (11th Cir. 2015) (per curiam) (applying *Daimler*'s test to reject general personal jurisdiction under the Fifth Amendment); *Abelesz v. OTP Bank*, 692 F.3d 638, 660 (7th Cir. 2012) (relying on *Goodyear*, 564 U.S. 915); *Fraser v. Smith*, 594 F.3d 842, 850 (11th Cir. 2010); *Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com. de Equip. Medico*, 563 F.3d 1285, 1297 (Fed. Cir. 2009); *Porina v. Marward Shipping Co.*, 521 F.3d 122, 129 (2d Cir. 2008); *Saudi v. Northrop Grumman Corp.*, 427 F.3d 271, 276 (4th Cir. 2005); *Saudi v. Acomarit Maritimes Servs., S.A.*, 114 F. App'x 449, 456 (3d Cir. 2004); *Base Metal Trading, Ltd. v. OJSC "Novokuznetsky Aluminum Factory"*, 283 F.3d 208, 215 (4th Cir. 2002); *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 620 (1st Cir. 2001); *Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1292-93 (11th Cir. 2000).

[23] In *Daimler*, the Supreme Court laid to rest the pervasive fallacy that *International Shoe*'s use of the words "continuous and systematic" describes the level of contacts necessary for exercising general personal jurisdiction. The Court explained that "the words 'continuous and systematic' were used in *International Shoe* to describe instances in which the exercise of *specific* jurisdiction would be appropriate." *Daimler*, 571 U.S. at 138, 134 S. Ct. at 761 (citing *Int'l Shoe*, 326 U.S. at 317, 66 S. Ct. at 159). The plaintiffs try to resuscitate that debunked notion.

19

159 (jurisdiction over a corporate defendant is proper "when the activities of the corporation [in the forum] have not only been continuous and systematic, *but also* give rise to the liabilities sued on" (emphasis added)).

Furthermore, the Second, Sixth, Seventh, Eleventh, Federal, and D.C. Circuits all agree that no meaningful difference exists between the Fifth and Fourteenth Amendments' minimum contacts analyses.[24]  In *Livnat v. Palestinian Authority*, 851 F.3d 45 (D.C. Cir. 2017), the court rejected the same federalism-based arguments urged here.  The court pointed out that the Supreme Court instinctively relied on its Fourteenth Amendment personal jurisdiction jurisprudence when presented with an argument that asserting jurisdiction in a Foreign Sovereign Immunity Act case would violate the Fifth Amendment Due Process Clause.[25]  *Id.* at 54 (citing *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 620, 112 S. Ct. 2160, 2169 (1992) (quoting *Burger King*, 471 U.S. at 475, 105 S. Ct. at 2183)).  The court noted that every circuit to "expressly analyze[] whether the Fifth and Fourteenth Amendment standards differ" agreed "that there is no meaningful difference in the level of contacts required for personal jurisdiction."  *Id.* at 54-55 (citations omitted).  The court rejected the argument that the Fourteenth Amendment's federalism concerns fundamentally differentiate it from the

---

[24] *Livnat v. Palestinian Auth.*, 851 F.3d 45, 54-55 (D.C. Cir. 2017); *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 330 (2d Cir. 2016); *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 449 (6th Cir. 2012); *Abelesz*, 692 F.3d at 660; *Oldfield v. Pueblo de Bahia Lora, S.A.*, 558 F.3d 1210, 1219 n.25 (11th Cir. 2009); *Porina*, 521 F.3d at 127-29; *Deprenyl Animal Health, Inc. v. Univ. of Toronto Innovations Found.*, 297 F.3d 1343, 1350 (Fed. Cir. 2002).

[25] To be sure, the defendants in that case only raised the personal-jurisdiction argument "as an aid in interpreting" FSIA's direct-effect requirement.  *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 619 n.2, 112 S. Ct. 2160, 2169 n.2 (1992) (quotation omitted).  But that in no way minimizes the significance of the fact that the Supreme Court's first instinct, when presented with a question of Fifth Amendment personal jurisdiction, was to turn to its Fourteenth Amendment precedent.

No. 20-30382
c/w No. 20-30379

Fifth Amendment precisely because a "'vital' purpose of personal-jurisdiction standards is to 'ensure[] fairness to the defendant'" and "protect 'the sovereign concerns of other nations' whose courts might otherwise adjudicate the claims." *Id.* at 55 (quoting *Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distribs. Pty. Ltd.*, 647 F.2d 200, 203 n.4 (D.C. Cir. 1981) (per curiam)). Such considerations "weigh at least as heavily in the Fifth Amendment context" as they do in the Fourteenth Amendment context. *Id.* And not insignificantly, the court notes that "[a]pplying consistent personal-jurisdiction standards under the Fifth and Fourteenth Amendments is . . . easier to administer." *Id.* at 55-56.

In the face of consistent authority from this and a large majority of the circuits, we decline to jury rig a novel personal jurisdiction test under the Fifth Amendment. We are not encouraged to do so because the Supreme Court has occasionally reserved deciding the question whether "the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court" as does the Fourteenth Amendment on state courts.[26] *See Bristol-Myers Squibb*, 137 S. Ct. at 1784; *Nicastro*, 564 U.S. at 885, 131 S. Ct. at 2790; *Omni Capital*, 484 U.S. at 102 n.5, 108 S. Ct. at 408 n.5; *Asahi*, 480 U.S. at 113 n.*. Most recently, members of the Court seemed uncertain about the tried and true Fourteenth Amendment standards. *See Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1032-33 (2021) (Alito, J., concurring); *Id.* at 1034-35, 1038 (Gorsuch, J., concurring). Far be

---

[26] It appears that the Court reserved only the predicate question whether it is appropriate under the Fifth Amendment to consider "*national* contacts, rather than . . . the contacts between the defendant and the State in which the federal court sits." *Asahi,* 480 U.S. at 113 n.* (emphasis added); *see also Bristol-Myers Squibb*, 137 S. Ct. at 1784 (citing *Omni Capital*, 484 U.S. at 102, n.5, which cites *Asahi*); *Nicastro*, 564 U.S. at 885, 131 S. Ct. at 2790 (citing *Asahi,* 480 U.S. at 113 n.*) (plurality); *Omni Capital*, 484 U.S. at 102 n.5, 108 S. Ct. at 408 n.5 (citing *Asahi*, 480 U.S. at 113 n.*). No one here disputes the applicability of national contacts under the Fifth Amendment.

No. 20-30382
c/w No. 20-30379

it for this lower court to muddy the waters further on a critical issue that precedes litigation in every federal court.

### 3. Rule 4(k)(2) is not rendered a nullity.

To support their proposed test, the plaintiffs contend that employing Fourteenth Amendment personal jurisdiction standards in the Fifth Amendment context renders Rule 4(k)(2) a nullity.[27]  The argument is both unpersuasive and belied by a formidable body of precedent.

As already explained, Rule 4(k)(2) is a procedural rule governing the territorial limits of effective service.  The Fifth Amendment due process limitations on a federal court's exercising jurisdiction over a foreign defendant exist independently of Rule 4(k)(2) and are indeed contemplated by the Rule itself.  Rendering an interpretation of the Fifth Amendment based on the effects that choice has on Rule 4(k)(2) would let the procedural tail wag the constitutional dog.

More important, courts are routinely employing Fourteenth Amendment personal jurisdiction standards in the Fifth Amendment context, yet Rule 4(k)(2) cases involving specific personal jurisdiction have arisen and continue to arise with regularity.  *See, e.g.*, *CGC Holding Co. v. Hutchens*, 974 F.3d 1201 (10th Cir. 2020); *Compania de Inversiones Mercantiles, S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*, 970 F.3d 1269 (10th Cir. 2020); *Plixer Int'l, Inc. v. Scrutinizer GmbH*, 905 F.3d 1 (1st

---

[27] Although the plaintiffs do not say so explicitly, perhaps their argument is that adopting *Daimler*'s "at home" requirement would render Rule 4(k)(2) inapplicable in general personal jurisdiction cases.  That might be true.  But even so, it is hardly troubling that federal courts can rarely, if ever, exercise personal jurisdiction over foreign defendants in cases raising claims that do not "arise out of or relate to" their contacts with the United States.  *Cf. Daimler*, 571 U.S. at 140-42, 134 S. Ct. at 762-63 (chastising Ninth Circuit for failing to give heed to the "risks to international comity its expansive view of general jurisdiction posed").

No. 20-30382
c/w No. 20-30379

Cir. 2018); *M-I Drilling Fluids UK Ltd. v. Dynamic Air Ltda.*, 890 F.3d 995 (Fed. Cir. 2018); *Adams*, 364 F.3d 646; *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548 (7th Cir. 2001).  The plaintiffs' rhetoric fades in the face of reality.

### 4. No admiralty law exception exists.

At a minimum, the plaintiffs contend, this case warrants a more-indulgent personal jurisdiction standard because it involves admiralty claims and admiralty is special.  Admiralty, they point out, is uniquely a creature of federal common law in addition to state and federal statutory law.  Admiralty's broad jurisdiction has been described as extending "to all acts and torts done upon the high seas, and within the ebb and flow of the sea."  2 Joseph Story, Commentaries on the Constitution of the United States 450, § 1665 (4th ed. 1873).  Indeed, in no other context do courts "have complete jurisdiction over suits . . . between foreigners."  *Langnes v. Green*, 282 U.S. 531, 544, 51 S. Ct. 243, 248 (1931).

The Fifth Circuit has long claimed expertise in and appreciation for admiralty's tradition and peculiar jurisprudence, but shibboleths cannot carry the plaintiffs' argument.  In fact, there is no textual support in the Fifth Amendment for the plaintiffs' proffered distinction and no case law favoring their theory.  About an admiralty "exception" to principles of personal jurisdiction, no more need be said:  The Due Process Clauses contain no exception.

Further, plaintiffs' historical argument misunderstands *The Belgenland*, 114 U.S. 355, 5 S. Ct. 860 (1885), on which they principally rely.  In that case, a federal court adjudicated a dispute arising out of a collision on the high seas between a Norwegian ship and a Belgian ship.  114 U.S. at 356-58, 5 S. Ct. at 860-61.  The federal courts exercised in rem jurisdiction over the foreign ship, jurisdiction obtained because a U.S. marshal arrested the

23

vessel at port *in the federal court's district.*  114 U.S. at 356, 5 S. Ct. at 860. Because a court's jurisdiction over a ship arrested in its own district is unassailable, personal jurisdiction there was a nonissue.  *Cf. Burnham v. Superior Ct. of Cal.*, 495 U.S. 604, 619, 110 S. Ct. 2105, 2115 (1990) (plurality) (concluding that "jurisdiction based on physical presence alone constitutes due process because it is one of the continuing traditions of our legal system that define the due process standard of 'traditional notions of fair play and substantial justice'").[28]  The plaintiffs have confused personal jurisdiction with subject matter jurisdiction, which the Supreme Court discussed in *The Belgenland.*  In sum, the plaintiffs' proposed admiralty-exclusive extension of due process standards for personal jurisdiction standard is all wet.

### D. NYK is not amenable to jurisdiction in this dispute.

The foregoing discussion explains why the standards governing personal jurisdiction are essentially the same under the Fifth and Fourteenth Amendment Due Process Clauses.  For federal claims filed in federal courts, of course, the relevant minimum contacts are those with the entire United States, not a forum state.  The Fifth Amendment Due Process Clause immunizes a non-resident, non-consenting defendant against a federal court's jurisdiction unless that defendant has "certain minimum contacts with [the United States] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe*, 326 U.S. at 316, 66 S. Ct. at 158.  Whether a defendant has "minimum contacts" with a forum depends on the nature and extent of "the defendant's relationship to the forum."  *Bristol-Myers*, 137 S. Ct. at 1779.  The focus on the

---

[28] It is true that *Pennoyer v. Neff*, 95 U.S. 714 (1877), preceded *The Belgenland* by a few years and was the first case in which the Supreme Court linked personal jurisdiction with due process.  As explained above, however, the latter case did not impinge on *Pennoyer*'s analysis.

No. 20-30382
c/w No. 20-30379

defendant's relationship with the forum underlies the general-specific jurisdiction dichotomy. *See Goodyear*, 564 U.S. at 919, 131 S. Ct. 2851.

General jurisdiction is the sole avenue for exercising jurisdiction over NYK here, because that is the only theory argued to the district court.[29] General jurisdiction extends to "any and all" claims against the defendant concerning events and conduct anywhere in the world. *Id.* But that breadth comes with a reciprocal limit: "Only a select 'set of affiliations with a forum' will expose a defendant to such sweeping jurisdiction." *Ford Motor Co.*, 141 S. Ct. at 1024 (quoting *Daimler*, 571 U.S. at 137, 134 S. Ct. at 760). Normally, a corporation is "at home" in its "place of incorporation and principal place of business." *Daimler*, 571 U.S. at 137, 134 S. Ct. at 760. But in an "exceptional case . . . a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in [the United States]." *Id.* at 139 n.19.

Exercising general jurisdiction over NYK does not comport with its Fifth Amendment due process rights. NYK is incorporated and headquartered in Japan. As a result, exercising general jurisdiction over NYK would require that its contacts with the United States "be so substantial and of such a nature to render [it] at home" in the United States. *Daimler*, 571 U.S. at 139 n.19, 134 S. Ct. at 761 n.19. *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437, 72 S. Ct. 413 (1952) remains the lodestar for such exceptional circumstances. In *Perkins*, the defendant,

---

[29] In the district court, the plaintiffs made clear that they did "not contend that the Court has specific jurisdiction over NYK," rather, they asserted that the court "has general jurisdiction over NYK." To the extent plaintiffs contend for the first time in this court that the district court could exercise specific jurisdiction over NYK, their argument is waived. *FDIC v. Mijalis*, 15 F.3d 1314, 1327 (5th Cir. 1994).

Benguet, was a Filipino corporation that operated gold and silver mines in the Philippines. *Id.* at 439. During World War II, Benguet's president relocated to Ohio and ran the company's operations from there. *Id.* at 447-48. Ohio state courts could exercise jurisdiction over Benguet because "Ohio was the corporation's principal, if temporary, place of business." *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 780 n.11, 104 S. Ct. 1473, 1481 n.11 (1984).

Not so with NYK and the United States. No doubt NYK's contacts with the United States are, in absolute terms, substantial. NYK ships call on at least fifty U.S. ports, and NYK even dedicates several ships exclusively to delivering cars between Japan and the United States. At one time, it operated twenty-seven shipping terminals and six air-cargo terminals in the United States.[30] Overall, its North American entities generate about $1.47 billion in consolidated revenue every year.[31]

But determining whether a defendant's contacts are "so substantial and of such a nature as to render the corporation at home" in the forum is an inherently comparative inquiry. *Daimler*, 571 U.S. at 139 nn.19, 20, 134 S. Ct. at 761-62 nn.19, 20. And comparatively, NYK's contacts with the United States comprise only a minor portion of its worldwide contacts. As the district court recognized: "All of NYK Line's high-level decision-making takes place in Japan, and port calls made to the United States represent just six to eight percent of all port calls made by NYK Line worldwide.

---

[30] NYK Group, Fact Book I 2017, 13-15 (Apr. 28, 2017), https://www.nyk.com/english/ir/library/fact/first/2017/__icsFiles/afieldfile/2019/10/17/2017_factbook01_all.pdf (last visited Oct. 23, 2021).

[31] The plaintiffs also draw attention to the fact that NYK often litigates in federal court, pointing out that, over the last decade, NYK has filed at least thirty lawsuits in federal district courts, and that over thirty lawsuits were filed against NYK in federal district courts. That a particular corporate defendant frequently litigates in a forum's courts also has no bearing on whether that defendant is essentially "at home" in the forum.

No. 20-30382
c/w No. 20-30379

Furthermore, NYK Line's American employees represent less than 1.5 percent of all [its] employees." Therefore, the United States is hardly "the center of [NYK's] activities" or a "surrogate for [NYK's] place of incorporation or head office." *Daimler*, 571 U.S. at 130 n.8, 134 S. Ct. at 756 n.8. The district court's determinations are not clearly erroneous, nor did it apply the law incorrectly. Accordingly, NYK is not amenable to the general jurisdiction of American courts despite its contacts with the United States.

## IV. Conclusion

Seventy-six years ago, Justice Frankfurter opined that "[t]o suppose that 'due process of law' meant one thing in the Fifth Amendment and another in the Fourteenth is too frivolous to require elaborate rejection." *Malinski v. New York*, 324 U.S. 401, 415 (1945) (Frankfurter, J., concurring). After considerable elaboration, this court confirms his intuition. We reject the plaintiffs' invitation to craft an atextual, novel, and unprecedented Fifth Amendment personal jurisdiction standard. Under the Supreme Court's reigning test for personal jurisdiction, the district court's well-reasoned judgment absolving NYK from appearing in federal court is AFFIRMED.

No. 20-30382
c/w No. 20-30379

JAMES C. HO, *Circuit Judge*, joined by COSTA, *Circuit Judge*, concurring:

The Fifth Amendment provides that no person may be "deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. Everyone agrees that this language applies only to the federal government, and that that's why we have the Fourteenth Amendment—to ensure that the states too may not "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV.

There's no denying the textual parallel between the Fifth and Fourteenth Amendments. That's why the majority today understandably construes "due process of law" to mean the same thing under the Fifth and Fourteenth Amendments alike.

Moreover, that approach is not only sensible as a textual matter—it also makes for a simpler body of federal constitutional law. Our legal system is already complex enough for litigants and lawyers, without additionally forcing people to navigate two distinct bodies of federal constitutional rights, depending on who's on the right side of the "v."

Accordingly, the majority reasonably holds—as has every other circuit to have addressed the issue—that, when faced with a Fifth Amendment question concerning personal jurisdiction, we apply Fourteenth Amendment precedent governing personal jurisdiction.

The lead dissent responds that the meaning of words can change over time. *See post*, at 43–44, 63 (Elrod, J., dissenting). As it correctly notes, the Fifth Amendment was ratified in 1791—while the Fourteenth Amendment was not ratified until 1868, three quarters of a century later. So the lead dissent suggests that, whatever "due process" may have meant in 1868, fidelity to original public meaning requires us to separately inquire whether "due process" may have meant something different in 1791.

28

No. 20-30382
c/w No. 20-30379

That's fair enough, as an intellectual matter. But in fairness to the majority, the lead dissent does not point to a single Supreme Court decision holding that we should interpret Fifth Amendment due process differently from Fourteenth Amendment due process.

It simply says that the Supreme Court has reserved the issue. *See post*, at 43 (Elrod, J., dissenting) (citing *French v. Barber Asphalt Pav. Co.*, 181 U.S. 324, 328 (1901)). For example, it points out that a majority of the Supreme Court once noted the possibility that a situation "may arise" in which it "may be proper" to construe the Fifth and Fourteenth Amendments differently. *French*, 181 U.S. at 328.

But *French* was issued before the Court embraced the doctrine of incorporation. I write separately to explain how the Supreme Court's approach to incorporation is hard to square as a logical matter with the lead dissent's theory of linguistic drift under the Due Process Clause.

## I.

Under the doctrine of incorporation, the Supreme Court has repeatedly held that we should interpret the Due Process Clause of the Fourteenth Amendment coextensively with a number of the provisions contained in the Bill of Rights. As a result, when it comes to rights that are incorporated against the states by the Due Process Clause, we apply the same body of law to the states that we do to the federal government.

The Supreme Court most recently reaffirmed these principles in the context of the Second Amendment right to keep and bear arms. Like the Fifth Amendment, "[t]he Second Amendment was adopted in 1791; the Fourteenth in 1868." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, _ U.S. _, _ (2022). "For decades, the Supreme Court has referred to the Second Amendment as a fundamental civil right, comparable to other provisions of the Bill of Rights." *Mance v. Sessions*, 896 F.3d 390, 398 (5th Cir. 2018) (Ho,

29

J., dissenting from denial of rehearing en banc) (citing, *e.g.*, *Johnson v. Eisentrager*, 339 U.S. 763, 784 (1950)).

Yet everyone agrees that the Second Amendment, like the Fifth Amendment, applies only to the federal government—hence the Fourteenth Amendment, which the Supreme Court has interpreted to apply fundamental rights like the Second Amendment to the states. *See McDonald v. City of Chicago*, 561 U.S. 742 (2010).

But if the Second Amendment is just like the Fifth Amendment— because both provisions precede the ratification of the Fourteenth Amendment by 77 years—does that mean that the right to keep and bear arms might apply differently to the United States than to the several states?

The Supreme Court has repeatedly held that the answer is no: "Bill of Rights protections" like the Second Amendment must "be enforced against the States under the Fourteenth Amendment according to the *same standards* that protect those personal rights against federal encroachment." *McDonald*, 561 U.S. at 765 (cleaned up) (emphasis added). *See also N.Y. State Rifle*, _ U.S. at _ (same).

There is, to be sure, a "scholarly debate" over whether courts should look to "the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868" or "the public understanding of the right when the Bill of Rights was adopted in 1791" when determining the scope of constitutional rights. *Id.* at _.

But the Supreme Court has held on numerous occasions that, whether we define the right as it existed in 1791 or in 1868, the right is the same against the federal government and the states alike. "[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the *same scope* as against the Federal Government." *Id.* (emphasis added).

No. 20-30382
c/w No. 20-30379

The Court cited several examples where it has taken that approach. *See*, *e.g.*, *Ramos v. Louisiana*, 590 U.S. _, _ (2020) ("This Court has long explained . . . that incorporated provisions of the Bill of Rights bear the *same content* when asserted against States as they do when asserted against the federal government.") (emphasis added); *Timbs v. Indiana*, 586 U.S. _, _ (2019) ("[I]f a Bill of Rights protection is incorporated, there is *no daylight* between the federal and state conduct it prohibits or requires.") (emphasis added); *Malloy v. Hogan*, 378 U.S. 1, 10–11 (1964) ("The Court thus has rejected the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights.") (quotations omitted).

To this list of examples, I'll add one more. The Court has decided various challenges to state abortion laws—including the partial birth abortion law that it held unconstitutional in *Stenberg v. Carhart*, 530 U.S. 914 (2000). In *Gonzales v. Carhart*, 550 U.S. 124 (2007), the Court addressed a constitutional objection to the federal Partial Birth Abortion Act.

Tellingly, the United States government did not even try to defend— and the Court did not uphold—the federal Partial Birth Abortion Act on the ground that Fifth Amendment due process is different from Fourteenth Amendment due process. Not a single justice even flagged it as a potential issue. Justice Thomas wrote separately to reaffirm his longstanding view that "the Court's abortion jurisprudence . . . has no basis in the Constitution" without attempting to draw any distinction between the Fifth and Fourteenth Amendments (as well as to ask, without deciding, whether the Act is allowed under the Commerce Clause). *Id.* at 168–69 (Thomas, J., concurring).[1]

---

[1] Nor was the argument presented by any of the parties in *Carhart*. The argument was made only by amicus, and only in the court of appeals, which rejected the argument on the merits. *See Carhart v. Gonzales*, 413 F.3d 791, 795 n.2 (8th Cir. 2005) ("One amicus

No. 20-30382
c/w No. 20-30379

## II.

I see logical difficulties in squaring the dissenters' theory of linguistic drift with the Supreme Court's longstanding incorporation jurisprudence.

To be sure, I'm all for following the text and original understanding of the Constitution to the maximum extent permitted by a faithful reading of Supreme Court precedent, as I've repeatedly noted. *See*, *e.g.*, *Williams v. Taylor Seidenbach, Inc.*, 958 F.3d 341, 350 (5th Cir. 2020) (en banc) (Ho, J., concurring); *Texas v. Rettig*, 993 F.3d 408, 409, 417–18 (5th Cir. 2021) (Ho, J., dissenting from denial of rehearing en banc); *Williams v. Homeland Ins. Co.*, 18 F.4th 806, 818–19 (5th Cir. 2021) (Ho, J., concurring). And reasonable minds can debate in good faith the Supreme Court's personal jurisdiction precedent, and ask whether it is faithful to the original understanding of the Constitution. *Cf. Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. _, _ & n.2 (2021) (Gorsuch, J., concurring) (citing differing views).

But the members of this court all agree that fidelity to Supreme Court precedent must trump fidelity to text and original public meaning. And that means reading precedent faithfully. "Lower court judges don't have license to adopt a cramped reading of a case in order to functionally overrule it." *NLRB v. Int'l Ass'n of Bridge, Structural, Ornamental, & Reinforcing Iron Workers, Local 229, AFL-CIO*, 974 F.3d 1106, 1116 (9th Cir. 2020) (Bumatay, J., dissenting from denial of rehearing en banc) (quotations omitted). *See also*

suggests *Stenberg* does not control because that case was decided under the Fourteenth Amendment, which, of course, does not apply to the federal government. While *Stenberg* was indeed a Fourteenth Amendment case, the Due Process Clause of the Fifth Amendment is textually identical to the Due Process Clause of the Fourteenth Amendment, and both proscribe virtually identical governmental conduct.") (citing *Malloy*, 378 U.S. at 8). The amicus declined to reprise the argument in the Supreme Court.

Josh Blackman, *Originalism and Stare Decisis in the Lower Courts*, 13 NYU
J.L. & Liberty 44, 51 (2019) ("Of course, judges can always draw razor-
thin distinctions and contend that a particular issue is not governed by a non-
originalist precedent.  But judges should resist this temptation.").  "[L]ogic
[may] demand[] that we extend an [allegedly] atextual body of precedent in
order to preserve rationality or consistency in the law."  *Williams*, 18 F.4th
at 821 (Ho, J., concurring).

Under the doctrine of incorporation, the Supreme Court has
repeatedly instructed that we must interpret the Due Process Clause of the
Fourteenth Amendment coextensively with various provisions of the Bill of
Rights.  And therein lies the logical challenge I see with the dissent's
proposed framework.  For if we accept the dissenters' theory of linguistic
drift when it comes to due process, logic would presumably require that we
entertain the possibility of linguistic drift in *every* aspect of due process.

For example, what does the First Amendment require when it comes
to the states?  Well, we know the First Amendment might have meant one
thing in 1791, but something quite different in 1868.  And so too with the
Second Amendment, the Fourth Amendment, the Eighth Amendment, and
so on.

So presumably the dissenters would apply a different body of First
Amendment law, Second Amendment law, and so on, to the states as
opposed to the federal government, in recognition of the possibility of
linguistic drift between 1791 and 1868.

But we don't do that.  Because the Supreme Court has told us we can't
do that—most recently, in *N.Y. State Rifle*.

And that's the logical problem I see with the dissent's approach.  If
Supreme Court precedent requires us to apply the *same* standard of "due
process" to the states and the federal government when it comes to *other*

No. 20-30382
c/w No. 20-30379

constitutional rights like the First and Second Amendments, what's the logic in applying *different* standards when it comes to due process itself?

If we're being principled about linguistic drift, we presumably wouldn't limit it to just the Fifth Amendment—or just the Due Process Clause of the Fifth Amendment. We would either allow for linguistic drift with respect to *every* provision of the Bill of Rights—or to *none* of them.

To my mind, logical fidelity to Supreme Court precedent would seem to suggest that the answer must be none.

### III.

In response, the lead dissent says that "due process" is different inasmuch as, unlike the incorporated provisions, it's actually codified in the text of the Fourteenth Amendment. *See post*, at 45–46 n.4 (Elrod, J., dissenting).

That's obviously true as far as it goes: due process explicitly appears in the text of the Fourteenth Amendment, while the incorporated provisions are implicit in due process by operation of Supreme Court precedent.

But why should that matter? The dissent doesn't explain. And it's hard to understand, especially considering that Supreme Court precedent essentially directs us to act as if the words of the First Amendment, the Second Amendment, and so on appear alongside the Due Process Clause in the Fourteenth Amendment. *See*, *e.g.*, *McDonald*, 561 U.S. at 791 ("[A] provision of the Bill of Rights that protects a right that is fundamental from an American perspective applies equally to the Federal Government and the States. We therefore hold that the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment.") (citation omitted).

Moreover, the dissent's logic, if anything, gets things exactly backwards. The Fifth and Fourteenth Amendment Due Process Clauses use

34

the same words—and so that's the reason we should apply *different* standards?  It's a curious way to split the baby.

Nor do I understand what the dissent hopes to accomplish by drawing a distinction between "reverse" versus "plain-vanilla" incorporation.  *See post*, at 45 n.4 (Elrod, J., dissenting).  I'll just sum things up this way: Everyone agrees that both the federal government and the states are subject to due process.  And everyone agrees that this includes not only due process *qua* due process, but also various other provisions in the Bill of Rights.  The only disagreement is whether we should apply the *same* legal standards under various provisions in the Bill of Rights—*except* for "due process" itself.  If there's a case for applying one body of law when it comes to all the provisions that due process incorporates, but two bodies of law when it comes to due process itself, I'm not sure what it is, and I'm not sure that the dissenters have made it.

## IV.

As for Judge Oldham's solo dissent, I'll begin by noting where we substantially agree.  Like me, Judge Oldham makes clear that he does not endorse the lead dissent's theory of linguistic drift.  *See post*, at 101 (Oldham, J., dissenting).  Like me, Judge Oldham does not say that there are two distinct bodies of due process law, one that governs the states and another that governs the federal government.  Rather, he suggests that "*none* of the personal-jurisdiction limits—for *any* government, state or federal—come from the Fifth or Fourteenth Amendments," but rather, "[t]hey instead come from the common law." *Id.* at 102–03 n.1.

So we agree that there is one body of due process law, not two.  Here's where we part company, then: If we're agreed that there's only a single body of due process law, then I don't see how we can ignore Supreme Court precedent under Fourteenth Amendment due process in a case involving

Fifth Amendment due process. And that's where my reference to the doctrine of incorporation comes in.

Judge Oldham dismisses my invocation of the incorporation doctrine on the ground that that is a doctrine of substantive due process—whereas this is a personal jurisdiction case, which implicates procedural due process. *See id.* at 102. He makes the same observation about the judicially-created right to abortion examined in *Carhart*. *See id.* at 103.

He's of course entirely right that both the incorporation doctrine generally, and abortion in particular, are creatures of substantive due process. But I don't see why the substantive/procedural due process distinction should make any difference here.

To explain why, let me first summarize his core argument. It proceeds like this: "The Supreme Court has confessed that its Fourteenth Amendment personal jurisdiction precedents do not rest on original public meaning." *Id.* at 102. Accordingly, he concludes, as originalists, we're allowed to ignore that body of law, which applies only to states, when it comes to Fifth Amendment cases, which involve the federal government. *Id.*

My response is that that is the opposite of what we do under the doctrine of incorporation—where we apply the same body of law to the states and the federal government.

It's also the opposite of what happened in *Carhart*. Just like the Court's personal jurisdiction precedents, the Supreme Court's abortion precedents "do not rest on original public meaning" (at least not before *Dobbs*). *Id.* Yet, as I point out, the federal government did not even bother to argue in *Carhart* that it can ignore the Court's Fourteenth Amendment abortion law when it comes to Fifth Amendment cases.

No. 20-30382
c/w No. 20-30379

Yes, those examples come from substantive due process—whereas this case involves procedural due process. But I'm not sure why we would apply one approach to precedent in substantive due process cases (follow the 14th when it comes to the 5th), and precisely the opposite approach to precedent in procedural due process cases (ignore the 14th when it comes to the 5th). I would have thought that our duty to be faithful to Supreme Court precedent doesn't wax and wane depending on which underlying body of law the precedent entails.

Finally, in a footnote, Judge Oldham notes that the Supreme Court has repeatedly declined to address the question of divergence in personal jurisdiction cases even after it started incorporating various other provisions. *See id.* at 103 n.2. Again, that's true, I just don't know what it proves. The Supreme Court ordinarily does not weigh in on issues absent a circuit split. And here, there is none—every circuit to have addressed the issue has rejected the theory of divergence when it comes to personal jurisdiction.

## V.

One final concern before I close: Embracing the linguistic drift theory urged by the lead dissent would involve an additional layer of complication—the launching of an unprecedented second body of substantive federal constitutional law.

Of course, if text and original understanding compel complexity, then complexity we shall give. But all things equal, we should endeavor to make the law simpler, not more byzantine.

Perhaps the Supreme Court will someday switch gears and embrace the dissent's view that due process under the Fifth Amendment is indeed different from due process under the Fourteenth Amendment. Perhaps the Court will one day hold that fidelity to text and original public meaning

37

No. 20-30382
c/w No. 20-30379

necessitates the complexity of developing two distinct bodies of federal constitutional rights—one against the feds and one against the states.

But until then, I will stick with the simplicity of the approach adopted by the majority of my colleagues—not to mention all of the circuits that have previously addressed the issue. I concur.

No. 20-30382
c/w No. 20-30379

JENNIFER WALKER ELROD, *Circuit Judge*, joined by GRAVES, HIGGINSON, WILLETT, and OLDHAM, *Circuit Judges*, dissenting:[*]

The majority today holds that the Fifth Amendment's Due Process Clause "immunizes" from suit in federal court a multinational corporation with extensive business dealings in the United States and which litigates here frequently as a plaintiff. Defendant–Appellee Nippon Yusen Kabushiki Kaisha ("NYK"), an international shipping conglomerate, calls regularly on American ports, operates numerous shipping terminals here, and reaps hundreds of millions of dollars in annual revenue in so doing. In the course of its substantial business here, NYK has invoked the power of our federal courts to protect *its* rights as a plaintiff over *seventy-five* times. But today, the *en banc* court holds that it would "offend 'traditional notions of fair play and substantial justice'" for injured United States servicemen and bereaved military families to sue NYK in United States federal court.

Today's result is as needless as it is confounding: The majority opinion fails to prove—as a matter of the Fifth Amendment's text, history, and structure—the existence of a principled limit on Congress's ability to authorize federal courts' personal jurisdiction over a foreign defendant. Relying entirely on inapposite Fourteenth Amendment precedent, the majority opinion arrives at a conclusion that will nullify Federal Rule of Civil Procedure 4(k)(2) in most of its applications, crush the chances of American terror victims seeking recovery in federal court, and, quite anomalously, afford foreign *civil* defendants greater due process protection than foreign *criminal* defendants.

---

[*] Judge Higginson joins Part VI of this opinion. Judge Oldham joins Parts II.B and VI of this opinion.

No. 20-30382
c/w No. 20-30379

Because the Fifth Amendment's Due Process Clause does not shield NYK from suit in United States federal court, I would hold that the district court has personal jurisdiction in this case. I respectfully dissent.

I.

The ACX Crystal, a foreign cargo ship, crashed into the U.S.S. Fitzgerald, a U.S. Navy destroyer, in Japanese waters. Seven sailors were killed. Forty were injured. Seeking damages under admiralty law and the Death on the High Seas Act, the bereaved and injured sued NYK, the foreign shipping company that chartered the vessel, in federal court.

In both cases consolidated before us on appeal, NYK sought and the district court granted dismissal for lack of personal jurisdiction. The injured Navy sailors and bereaved families appealed. They argued that the Fifth rather than Fourteenth Amendment governed the extent of federal courts' personal jurisdiction over foreign defendants pursuant to Federal Rule of Civil Procedure 4(k)(2). And the Supreme Court's Fourteenth Amendment personal jurisdiction precedents, they argued cogently, neither bind us nor should be imported into the Fifth Amendment context.

Bound by a prior panel opinion, *Patterson v. Aker Solutions, Inc.*, 826 F.3d 231 (5th Cir. 2016), this court affirmed, in keeping with the rule of orderliness. *Douglass v. Nippon Yusen Kabushiki Kaisha*, 996 F.3d 289, 297–300 (5th Cir. 2021). Without discussion of the relevant differences between the Constitution's due process clauses, *Patterson* had applied recent Supreme Court precedents from the Fourteenth Amendment context to a Fifth Amendment case. *Patterson*, 826 F.3d at 234. The panel in this case noted that it was constrained to do the same. But it added that, absent *Patterson*, plaintiffs–appellants' position was "persuasive," and indeed, "ha[d] merit." *Douglass*, 996 F.3d at 293–97.

40

No. 20-30382
c/w No. 20-30379

Two panel members specially concurred. *Id.* at 300–02 (Elrod, J., joined by Willett, J., specially concurring). The concurrence "agree[d] with the majority opinion that the case would be decided differently if we were not bound by *Patterson*," and called all hands on deck to reevaluate our precedent. *Id.* Several important considerations counseled in favor of "apply[ing] a jurisdictional framework that distinguishes between Fifth Amendment and Fourteenth Amendment due process standards." *Id.* at 301. For one thing, "the federalism concerns that animate the Supreme Court's jurisprudence on the jurisdictional limitations of the Fourteenth Amendment's Due Process Clause are irrelevant in the Fifth Amendment context." *Id.* We further warned against "imposing restraints on federal courts' exercise of personal jurisdiction (and . . . Congress's ability to authorize jurisdiction by statute) beyond what the Constitution requires." *Id.* With these concerns in mind, we invited the court to take a different tack *en banc*.

The full court accepted our invitation to reconsider the propriety of applying the Supreme Court's Fourteenth Amendment precedents in the Fifth Amendment context. But today the majority opinion declines to chart a new course, leaving our precedent at sea and the plaintiffs high and dry.

II.

What does the Due Process Clause of the *Fifth* Amendment have to say about personal jurisdiction?

Our circuit's precedents are awash with confusion: On the one hand, we have made clear that the Fifth Amendment—and *not* the Fourteenth Amendment—governs due process challenges to federal courts' exercise of jurisdiction over foreign defendants pursuant to Rule 4(k)(2). *See, e.g.*, *Submersible Sys., Inc. v. Perforadora Cent., S.A. de C.V.*, 249 F.3d 413, 420 (5th Cir. 2001) ("The due process required in federal cases governed by Rule

No. 20-30382
c/w No. 20-30379

4(k)(2) is measured with reference to the Fifth Amendment, rather than the Fourteenth Amendment."). On the other hand, our Rule 4(k)(2) personal jurisdiction cases have generally tracked Supreme Court case law from the Fourteenth Amendment context. *See, e.g.*, *Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 652 (5th Cir. 2004) (citing Fourteenth Amendment precedent including *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984), and *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980)); *Patterson*, 826 F.3d at 234 (applying *Daimler AG v. Bauman*, 571 U.S. 117 (2014)).

Left entirely unexplained is *why* we have silently imported Fourteenth Amendment jurisprudence into our Fifth Amendment cases. We have assumed, without argument, that the Fifth and Fourteenth Amendment Due Process Clauses operate in exactly the same manner vis-à-vis personal jurisdiction. *See, e.g.*, *Patterson*, 826 F.3d at 234 (providing no explanation for the case's application of the latest Fourteenth Amendment precedents from the Supreme Court in ruling on a Fifth Amendment question); *World Tanker Carriers Corp. v. M/V Ya Mawlaya*, 99 F.3d 717, 723–24 (5th Cir. 1996) (applying, without explanation, the "now familiar [Fourteenth Amendment] minimum contacts analysis" in a Rule 4(k)(2) personal jurisdiction case, without even mentioning the Fifth Amendment once). But this unspoken assumption is unsound. The Fifth Amendment does not merely carry Fourteenth Amendment ballast. It has its own text, history, and structural implications. Its Due Process Clause need not parrot what the Supreme Court has said about the Fourteenth's.

Perhaps our court has considered the relationship between the Fifth and Fourteenth Amendment Due Process Clauses too obvious to require argument. The majority opinion implies as much with its concluding quotation from Justice Frankfurter's solo concurrence in *Malinski v. New York*, 324 U.S. 401 (1945): "To suppose that 'due process of law' meant one

42

thing in the Fifth Amendment and another in the Fourteenth is too frivolous to require elaborate rejection." *Id.* at 415 (Frankfurter, J., concurring); *ante* at 27. A six-justice majority of the Supreme Court, however, has taken a different view, writing: "[A]s the[] [Fifth and Fourteenth Amendments] were ingrafted upon the Constitution at different times and in widely different circumstances of our national life, it may be that questions may arise in which different constructions and applications of their provisions may be proper." *French v. Barber Asphalt Pav. Co.*, 181 U.S. 324, 328 (1901);[1] *see also Wight v. Davidson*, 181 U.S. 371, 384 (1901) ("[I]t by no means necessarily follows that a long and consistent construction put upon the 5th Amendment [Due Process Clause] . . . is to be deemed overruled by a decision concerning the operation of the 14th Amendment as controlling state legislation."); *Carroll v. Greenwich Ins. Co. of N.Y.*, 199 U.S. 401, 410 (1905) (Holmes, J.) (refusing to "affirm that in no instance could a distinction [between the amendments] be taken").

The relationship between the amendments' Due Process Clauses and the limits of federal courts' personal jurisdiction clearly merits "considerable elaboration." *Ante* at 27. Far from frivolous, this thorny topic has launched more than a few law review articles.[2] Indeed, the latest originalist scholarship strongly suggests that "'due process of law' has undergone linguistic drift." Max Crema & Lawrence B. Solum, *The Original Meaning of "Due Process of*

---

[1] *Contra French*, 181 U.S. at 355 (Harlan, J., dissenting) ("[D]ue process of law cannot mean one thing under the 5th Amendment and another thing under the 14th Amendment, the words used being the same in each amendment.").

[2] For just a small sampling, *see generally, e.g.*, Stephen E. Sachs, *The Unlimited Jurisdiction of the Federal Courts*, 106 Va. L. Rev. 1703 (2020); Jonathan Remy Nash, *National Personal Jurisdiction*, 68 Emory L.J. 509 (2019); Wendy Perdue, *Aliens, the Internet, and "Purposeful Availment": A Reassessment of Fifth Amendment Limits on Personal Jurisdiction*, 98 Nw. U. L. Rev. 455 (2004); *see also* Stephen E. Sachs, Pennoyer *Was Right*, 95 Tex. L. Rev. 1249 (2017).

No. 20-30382
c/w No. 20-30379

*Law" in the Fifth Amendment*, 108 Va. L. Rev. 447, 453 (2022). That is, "its meaning has changed since the First Congress proposed [the Fifth Amendment] for ratification" in 1789, and before the 39th Congress proposed the Fourteenth Amendment in 1866. *Id.* at 453, 461–524 (examining a wide array of primary sources and conducting rigorous historical and corpus-linguistics analysis). Thus, it is quite reasonable to think that the original public meaning of the Fifth Amendment's Due Process Clause diverges from the Fourteenth Amendment's as it bears upon personal jurisdiction—particularly given the interstate-federalism principles baked into the Fourteenth Amendment.[3]

The Supreme Court itself has specifically flagged and repeatedly reserved the question before us for another day. *See, e.g.*, *Bristol-Myers Squibb Co. v. Sup. Ct. of Cal., S.F. Cnty.*, 137 S. Ct. 1773, 1783–84 (2017) ("[S]ince our decision concerns the due process limits on the exercise of specific jurisdiction by a State, we leave open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal

---

[3] The concurring opinion readily acknowledges the theoretical possibility of linguistic drift over time. *Ante* at 28 (Ho, J., concurring). Although my concurring colleague comes to a different conclusion, he recognizes that it is "fair enough, as an intellectual matter" to account for linguistic drift in discerning constitutional provisions' original public meanings. *Id.* at 29. Our disagreement flows not from our judicial philosophies but from our divergent good-faith readings of Supreme Court precedent. *See, e.g.*, *infra* n.4.

Relatedly, the concurring opinion expresses an additional concern that this theory of linguistic drift would introduce "an additional layer of complication" in federal constitutional law—and "all things equal, we should endeavor to make the law *simpler*, not more byzantine." *Ante* at 37 (Ho, J., concurring) (emphasis added). We ought not opt for Occam over originalism. The concurring opinion agrees. *Id.* ("Of course, if text and original understanding compel complexity, then complexity we shall give."). But *ceteris paribus*, simplicity would weigh in favor of fewer limits on personal jurisdiction, not more. And that simpler result aligns with the original meaning of the Fifth Amendment's Due Process Clause. *See infra* n.35.

No. 20-30382
c/w No. 20-30379

jurisdiction by a federal court."); *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 885 (2011) (plurality op.) (noting that it was unnecessary "to address . . . any constitutional concerns that might be attendant" to more expansive federal court exercises of personal jurisdiction over foreign defendants); *post* at 96 (Higginson, J., dissenting).[4]

---

[4] *See also, e.g.*, *Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 102 n.5 (1987) (stating that the Court had no occasion to address the Fifth Amendment's applicability to personal jurisdiction); *Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Cnty.*, 480 U.S. 102, 113 n.* (1987) (same).

In the face of the Supreme Court's repeated reservation of this question for a future case, the concurring opinion claims that the Court has already answered it. *Ante* at 29–31 (Ho, J., concurring). It has not.

The concurrence first relies on the Court's statements about incorporation doctrine. The argument seems to go like this: (A) the Supreme Court has held that "incorporated provisions of the Bill of Rights bear the same content when asserted against States as they do when asserted against the federal government," *id.* at 31 (quoting *Ramos v. Louisiana*, 140 S. Ct. 1390, 1397 (2020) (emphasis omitted)); (B) the Fourteenth Amendment's Due Process Clause incorporates the Fifth Amendment's Due Process Clause against the states; thus, the concurrence concludes, (C) any Fifth Amendment rights vis-à-vis personal jurisdiction must "bear the same content" as those under the Fourteenth Amendment's Due Process Clause, *id.* at 29–31.

There are at least two problems with this argument. First, it turns incorporation doctrine upside-down. This case is actually about *reverse* incorporation—that is, reading (newer) *Fourteenth* Amendment jurisprudence into the (older) *Fifth* Amendment Due Process Clause, rather than vice versa. And none of the concurrence's plain-vanilla incorporation cases suggest we must—or even should—transplant the Supreme Court's personal jurisdiction doctrine from the Fourteenth Amendment into the Fifth Amendment. Second, it is hardly obvious that the Fifth Amendment's Due Process Clause is "just like" the Second Amendment or any other provision in the Bill of Rights vis-à-vis incorporation. *Id.* at 30. With due process, the Amenders did something special: they gave the Fourteenth Amendment *its own* Due Process Clause. So, the Fifth Amendment's Due Process Clause never needed to be "incorporated" *through* the Fourteenth Amendment's Due Process Clause. The former never needed to pass through the latter's lens to be refracted against the states. The Fourteenth Amendment's Due Process Clause *already* applied to the states directly. For that reason, it does not follow that the scope of the rights protected by the two clauses must bear the same content. Incidentally, this also explains why linguistic drift is relevant *only* to the Fifth Amendment context—and thus why we

45

No. 20-30382
c/w No. 20-30379

In my view, it is precisely our duty as an inferior court to percolate the arguments raised by this novel constitutional issue for eventual Supreme Court review. *Cf. Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring in grant of stay) (noting that the percolation "process that permits the airing of competing views . . . aids this Court's own decisionmaking process"); *Box v. Planned Parenthood of Ind. & Ky., Inc.*, 139 S. Ct. 1780, 1784 (2019) (Thomas, J., concurring) ("[F]urther percolation may assist our review of [an] issue of first impression . . . ."). We are asked in this case to interpret the Fifth Amendment's Due Process Clause with respect to federal court personal jurisdiction—a question of first impression that the Supreme Court has repeatedly declined to answer. And when we are called to interpret a constitutional provision without on-point Supreme Court guidance, we should look first to the Constitution's text, history, and structure before we borrow freely from adjacent Supreme Court jurisprudence.[5]

---

would not "apply a different body of First Amendment law, Second Amendment law, and so on, to the states as opposed to the federal government." *See id.* at 33.

In support of its view, the concurring opinion also points to *Gonzales v. Carhart*, 550 U.S. 124 (2007), where the Court upheld a federal-law abortion restriction without considering whether the Fifth Amendment's Due Process Clause creates a different framework than the Fourteenth Amendment's when it comes to abortion jurisprudence. *See ante* at 31 (Ho, J., concurring). *Carhart* is wholly inapposite. No scholar, litigant, or jurist had offered any plausible reason to think that the original public meaning of the Fifth and Fourteenth Amendments differed as to the permissibility of abortion restrictions. Here by contrast, as multiple scholars have explained in detail, the Fifth and Fourteenth Amendments had distinct original understandings when it came to the jurisdictional restrictions they imposed on federal and state courts, respectively. *See, e.g.*, Sachs, *Unlimited Jurisdiction*, *supra*, at 1708–09, 1710–27. The non-discussion of an irrelevant question in an unrelated case does not prevent us from reaching the right answer to a constitutional question that the Supreme Court has expressly left open.

[5] *Cf.* Antonin Scalia, *Common Law Courts in a Civil-Law System in* A Matter of Interpretation 39 (1997) (disapprovingly describing constitutional analysis that takes as its "starting point" Supreme Court case law and thus removes from focus the Constitution's

No. 20-30382
c/w No. 20-30379

We are bound to apply controlling law as it stands.  In this case, there is no controlling Supreme Court precedent.  What controls is the Fifth Amendment Due Process Clause.  If the *en banc* majority is convinced that the Fifth Amendment Due Process Clause, as originally understood, imposes the same set of jurisdictional rules that the Supreme Court has decreed pursuant to the Fourteenth Amendment, then it bears the burden of proving that with reference to the Fifth Amendment's text, history, and structure. The majority opinion has made no such effort.  *See ante* at 7 n.8.  It fails to meet its burden from the very get-go.[6]  Indeed, the majority opinion could

---

"original text and understanding"); *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1036 n.2 (2021) (Gorsuch, J., concurring in the judgment) (indicating that "the right question" to be asking in Fourteenth Amendment personal jurisdiction context is "what the Constitution as originally understood requires").

Both parties in this case ask us to take as our "starting point" Supreme Court personal jurisdiction case law from the Fourteenth Amendment context.  Appellees vigorously contend that Fourteenth Amendment personal jurisdiction case law, particularly *Daimler*, 571 U.S. 117, controls our interpretation of the Fifth Amendment's Due Process Clause in this case.  Meanwhile, appellants argue that Fourteenth Amendment case law does not bind us in the Fifth Amendment context; but they nonetheless ask us to kick off our analysis with *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), while refraining from relying on its progeny.  I disagree with both approaches because both start not with the Fifth Amendment but with inapplicable Fourteenth Amendment case law.

Thus, I agree with the majority opinion that we ought to "reject the plaintiffs' invitation to craft an atextual, novel, and unprecedented Fifth Amendment personal jurisdiction standard" that is not founded upon the amendment's original understanding. *Ante* at 27.  But, as I explain in this dissent, we *also* ought to reject NYK's invitation to calcify our current Fifth Amendment precedents, which erroneously import Fourteenth Amendment Supreme Court jurisprudence.

[6] The majority opinion's footnoted response to this dissent is unresponsive on this score: Lacking Supreme Court case law restricting federal courts' exercise of personal jurisdiction under the Fifth Amendment, NYK must convince us, as a matter of text, history, and structure, that the Fifth Amendment's Due Process Clause merely mimes the Fourteenth's as to personal jurisdiction.  But NYK has made no such argument, and nor has the majority opinion. *See ante* at 7 n.8.

No. 20-30382
c/w No. 20-30379

In fact, the majority opinion expressly refuses to engage with the contrary arguments presented in this dissent, declining to address anything but "the *exact* arguments raised by the plaintiffs." *Id.* (emphasis added). Respectfully, I do not think our approach should be so blinkered. Of course we take cases as they are presented to us, but that does not mean that we must parrot parties' "exact" views in our opinions. Our duty is to resolve the appeal correctly and offer our *independent* explanation of the bases for *our* decision. *See United States v. Brace*, 145 F.3d 247, 267 (5th Cir. 1998) (*en banc*) (DeMoss, J., dissenting) ("To refrain from independent analysis is to abdicate the essential function of judging. . . . Just as we do not abdicate our judicial responsibilities and blindly accept the parties' stipulations, neither do we don blinders and confine our consideration to those legal doctrines that are presented by the parties.").

More to the point, however, plaintiffs-appellants themselves raised all the arguments necessary to succeed here on appeal: Although neither they nor their *amici* ground their proposed 'national contacts' test in the original understanding of the Fifth Amendment, they *did* argue—quite correctly—that Fifth Amendment personal jurisdiction standards are not dictated by Fourteenth Amendment jurisprudence. *See* Appellants' *En Banc* Br. 18–20, 18 n.5 (citing, *inter alia*, Sachs, *Unlimited Jurisdiction*, *supra*, and early nineteenth-century cases *Picquet v. Swan*, 19 F. Cas. 609 (C.C.D. Mass. 1828) and *Toland v. Sprague*, 37 U.S. 300 (13 Pet.), 327 (1838)); *En Banc* Oral Argument at 25:20–25:57 (noting but not relying upon originalist scholarship to fashion a middle-ground 'national contacts' test); *id.* at 58:12–58:53 ("It's also important to understand that there is considerable originalist scholarship that the Fifth Amendment does not address personal jurisdiction. I mentioned the Stephen Sachs article, he's actually written several articles to that effect.").

That being the case, the onus was on NYK to persuade us that we should continue to use Fourteenth Amendment jurisprudence to cast light on the Fifth Amendment and restrict the constitutional applicability of Rule 4(k)(2). *Cf. Baldwin v. Missouri*, 281 U.S. 586, 599 (1930) ("As this Court has often held, the burden rests upon him who assails a statute to establish its unconstitutionality."); *Brown v. Maryland*, 25 U.S. (12 Wheat.) 419, 436–37 (1827) ("It has been truly said, that the presumption is in favour of every legislative act, and that the whole burthen of proof lies on him who denies its constitutionality."). In my view, NYK has failed to do so. And, without a reason to affirm the district court's restrictive view of its ability to exercise personal jurisdiction under the Fifth Amendment's Due Process Clause, we should overrule our misguided precedents in this area and reverse the district court's dismissal for lack of jurisdiction.

The majority opinion further suggests that this dissent fails on its own terms because Congress has not acted to extend federal court jurisdiction. *See ante* at 7 n.8; *infra* section II.B. Not so. Rule 4(k)(2), promulgated and enacted pursuant to the Rules Enabling Act with Congress's imprimatur, plainly supports personal jurisdiction here. *See* Fed. R. Civ. P. 4(k)(2); 28 U.S.C. §§ 2071–2077; *id.* §§ 2074, 2075 (providing Congress

not meet its burden if it tried.  The text, history, and structural implications of the Fifth Amendment Due Process Clause suggest that its original public meaning imposed few (if any) barriers to federal court personal jurisdiction.

A.

First, the text.  The Fifth Amendment Due Process Clause provides: "No person shall be . . . deprived of life, liberty, or property, without due process of law[.]"  U.S. Const. amend. V.  This provision, Justice Joseph Story explained in 1833, draws upon "the language of magna charta, '*nec super eum ibimus, nec super eum mittimus, nisi per legale judicium parium suorum, vel per legem terrae*,' neither will we pass upon him, or condemn him, but by the lawful judgment of his peers, or by the law of the land."[7]  3 Joseph Story, Commentaries on the Constitution of the United States § 1783 (Hillard, Gray, & Co. 1833).  Citing the renowned seventeenth century English jurist Lord Coke, Alexander Hamilton wrote in 1784 that "[i]f we enquire what is meant by the law of the land, the best commentators will tell us, that it means *due process of law, that is, by indictment or presentment of good and lawful men*, and trial and conviction in consequence."  Alexander Hamilton, *A Letter from Phocion to the Considerate Citizens of New York* (Jan. 1784), *reprinted in* 3 The Papers of Alexander Hamilton 485, 485–86 (Harold C. Syrett & Jacob E. Cooke eds., 1962) (emphasis in original) (referring to

---

with a statutory window of at least seven months to reject, modify, or defer any proposed rule, after which period proposed rules take effect with Congressional approval).

[7] Up until about a century ago, the predominant spelling of the Great Charter was "*Magna Charta*," pronounced the same as it is today (with a hard -k- sound).  *See* Bryan A. Garner, *A Magna Carta Style Guide*, 101 A.B.A. J. 26, 26 (2015).  In an "astonishingly swift reversal of linguistic fortune," English speakers in the twentieth century began spelling it "*Magna Carta*," at least in part because of pervasive mispronunciation with a -ch-sound.  *See id.*

No. 20-30382
c/w No. 20-30379

2 Edward Coke, Institutes of the Lawes of England 50 (1642)).[8]  Indeed, the relationship between "law of the land" and "due process of law" antedates Lord Coke's magisterial interpretation of Magna Carta by nearly three centuries.[9]

Over the course of almost six centuries between the signing of Magna Carta in 1215 and the American Founding in the late eighteenth century, the related phrases "law of the land" and "due process of law" came to signify the procedural protections of the English positive law.[10]   Sir William

---

[8] Justice Story also cited Lord Coke in making the broader assertion that "*per legem terrae* (by the law of the land) mean[s] by due process of law."  *See* Story, *supra*, at § 1783; Crema & Solum, *supra*, at 516–24 (arguing that Justice Story may have misread Lord Coke in conflating the broader legal expression "law of the land" with its narrower subset "due process of law").  Mid-nineteenth century cases began to adopt Justice Story's broad equation of "law of the land" with "due process of law."  *See, e.g.*, *Den ex dem. Murray v. Hoboken Land & Imp. Co.*, 59 U.S. (18 How.) 272, 276 (1855) ("The words, 'due process of law,' were undoubtedly intended to convey the same meaning as the words, 'by the law of the land,' in *Magna Charta*." (citing, *inter alia*, Lord Coke)).  But, as Hamilton's "Letter from Phocion" illustrates, the Founding generation understood "law of the land" to encompass both "due process of law" (*i.e.*, indictment, presentment, service of the proper writ) *and* civil and criminal procedure more generally (*i.e.*, motions practice, trial).  *See* Crema & Solum, *supra*, at 504–06.  Thus, "due process of law," as originally understood at the time that the Fifth Amendment was proposed and ratified, likely had a narrower meaning than it came to have by the time the Fourteenth Amendment was proposed and ratified. *See also infra* section II.C.1.

[9] *See* 28 Edw. 3, c. 3 (1354) (Eng.) (implementing Magna Carta's thirty-ninth chapter and using "due Process of the Law" (albeit in law French) in place of "law of the land").  Note that Magna Carta's chapter divisions were only standardized in the eighteenth century by Sir William Blackstone. On Blackstone's numbering system, the '*per legem terrae*' chapter is *thirty-nine* in the original 1215 Magna Carta, and *twenty-nine* in the 1225 issue, which is also frequently cited.

[10] *See* Ryan C. Williams, *The One and Only Substantive Due Process Clause*, 120 Yale L.J. 408, 428–34 (2010) ("[A]n eighteenth-century reader well-versed in English law would likely have understood both the law of the land and due process of law to require only compliance with duly enacted positive law . . . ."); *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 276 (1856) ("'[D]ue process of law' generally

No. 20-30382
c/w No. 20-30379

Blackstone, for instance—another renowned English jurist whose work, like Coke's, deeply influenced American legal thought—wrote of "the affirmative acts of parliament wherein justice is directed to be done according to *the law of the land*," and noted that the law of the land "depends not upon the arbitrary will of any judge; but is permanent, fixed, and unchangeable, *unless by authority of parliament*." 1 William Blackstone, Commentaries *141– 42 (emphasis added).

An early eighteenth-century case, *Regina v. Paty* (1704) 92 Eng. Rep. 232 (Q.B.), exemplified the prevailing conception of due process in the years leading up to the American Founding. Petitioners in that case sought *habeas corpus*, having been jailed on a warrant issued by the speaker of the House of Commons for allegedly breaching parliamentary privilege. *Id.* at 232–33. They argued that their incarceration violated Magna Carta's assurance that "no man ought to be taken or imprisoned but by the law of the land." *Id.* at 233 (reporting petitioners' objections). Three of the four justices hearing the case denied the petitioners' claim. *Id.* at 232–33 (Gould, J.), 233–35 (Powys, J.), 235–36 (Powell, J.). As reported, Justice Powys addressed petitioners' argument as follows:

> [T]o this I answer, that *lex terrae* is not confined to the common law, but takes in all the other laws, which are in force in this realm; as the civil and canon law, &c. and among the rest, the *Lex Parliamenti*. By the 28 Ed. 3, c. 3, there the words *lex terrae*, which are used in *Mag. Char.* are explained by the words, *due process of law*; and the meaning of the statute is, that all commitments must be by a legal authority. And the law of Parliament is as much a law as any; nay, if there be any superiority, this is a superior law.

---

implies and includes *actor*, *reus*, *judex*, regular allegations, opportunity to answer, and a trial according to some settled course of judicial proceedings . . . .").

*Id.* at 234 (emphasis added). The sole dissenting justice, Chief Justice Holt, did not disagree with this premise; he disagreed only as to the legal status of the House of Commons warrant in question. *Id.* at 236–37 (Holt, C.J., dissenting). Thus, the Queen's Bench was unanimous as to this central point: Magna Carta's guarantee of due process did not extrinsically constrain the legislative process. It required only that legal deprivation be preceded by lawful process, in keeping with the common law or duly enacted legislation.[11]

Early American colonists quickly transplanted this deeply rooted English legal tradition in their own governing documents. Using variations on the longstanding phrases "law of the land" and "due process of law," the colonists brought with them the legal soil of their forebears in their first charters and declarations of rights.[12] The same language carried over into

---

[11] Some fifty years earlier, in another English case, a *habeas corpus* petitioner similarly invoked the "29th chapter of Magna Carta" and its statutory complement (42 Edw. 3, c. 3) against the Parliamentary warrant on which he had been arrested, asserting that he had "been proceeded against not according to the law of the land." *Case of Captain Streater*, 5 How. St. Tr. 366, 374–86 (1653); *see also supra* n.9 (explaining Magna Carta's chapter-numbering conventions). The judge in that case was perhaps even less impressed with the argument than the Queen's Bench in *Paty's Case*: "[Petitioner's counsel] says, The parliament hath not the power to alter the laws. Why, they have the legislative power, and may alter and order in such sort as they please; they may daily. . . . It is strange a counsellor should say this." *Captain Streater*, 5 How. St. Tr. at 386. "[I]n all justice, an inferior court cannot controul what the Parliament does. . . . We must submit to the legislative power . . . ." *Id.*

[12] *See, e.g.*, The New York Charter of Liberties and Privileges ¶ 13 (1683) ("Noe freeman shall be taken and imprisoned or be disseized of his Freehold or Libertye or Free Customes or be outlawed or Exiled or any other wayes destroyed nor shall be passed upon adjudged or condemned But by the Lawfull Judgment of his peers and *by the Law of this province*." (emphasis added)); An Act Declaring What Are the Rights and Priviledges, of His Majesty's Subjects, Inhabiting Within this Province of East New Jersey (1698) (using both "laws of this Province" and "due course of law").

Quite recently, two scholars have suggested that three interrelated legal phrases stemming from Magna Carta and six subsequent Edwardian statutes—"law of the land," "course of law," and "due process of law"—were in use during the Founding era and

No. 20-30382
c/w No. 20-30379

state constitutions,[13] the Northwest Ordinance,[14] and eventually, the Fifth Amendment to the federal Constitution.[15]

---

generally understood to mean somewhat different things: "law of the land" referred most broadly to the English positive law; "course of law" meant legal procedure; and "due process of law" referred rather narrowly to the appropriate "process"—that is, "'writs or precepts that go forth' from a court" by which "[g]overnment officials . . . issue orders, impose obligations, or grant rights." *See* Crema & Solum, *supra*, at 461–525; *id.* at 465 (quoting *Process*, 2 Timothy Cunningham, A New and Complete Law-Dictionary (London, 1765)).

[13] *See, e.g.*, Md. Const. of 1776, Declaration and Charter of Rights, art. 21 ("That no freeman ought to be taken, or imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner destroyed, or deprived of his life, liberty, or property, but by the lawful judgment of his peers, or by the law of the land."); N.Y. Const. of 1777, art. XIII ("[N]o member of this state shall be disfranchised, or deprived of any the rights or privileges secured to the subjects of this State by this constitution, unless by the law of the land, or the judgment of his peers."). Some states tailored these provisions more narrowly to the criminal context, *e.g.*, Pa. Const. of 1776, Declaration of Rights, art. IX ("That in all prosecutions for criminal offences, a man . . . [cannot] be justly deprived of his liberty except by the laws of the land, or the judgment of his peers."), while others phrased the provisions to provide protections for criminal defendants but did not expressly cabin the scope to only criminal defendants, *e.g.*, Mass. Const. pt. I, art. XII (1870) ("[N]o subject shall be arrested, imprisoned, despoiled, or deprived of his property, immunities, or privileges, put out of the protection of the law, exiled, or deprived of his life, liberty, or estate, but by the judgment of his peers, or the law of the land."). *See* Williams, *supra*, at 437–38 & nn.120–22; *see also* Edward S. Corwin, *The Doctrine of Due Process of Law Before the Civil War*, 24 Harv. L. Rev. 366, 370–71 (1911) (arguing that "the phrase 'law of the land,' which is the universal form in [early state] constitutions, [did not] import any limitation upon legislative power").

[14] Ordinance of 1787: The Northwest Territorial Government, art. II, U.S.C. LV, LVI (2006) ("No man shall be deprived of his liberty or property but by the judgment of his peers, or the *law of the land* . . . ." (emphasis added)).

[15] Notes from the constitutional convention or the ratification debates provide little aid in understanding the Fifth Amendment's Due Process Clause. *See* 1 Annals of Cong. 434 (James Madison introducing the amendment), 753–54 (debating other clauses of the amendment, but not the due process clause). "The immediate inspiration for Madison's proposal was most likely Article II of the Northwest Ordinance," which had a provision like those adopted in state constitutions and which Congress passed a few years earlier. *See* Williams, *supra*, at 446 n.156 (quoting Ordinance of 1787: The Northwest Territorial

No. 20-30382
c/w No. 20-30379

B.

In light of the text and history behind the Fifth Amendment's Due Process Clause, what bearing (if any) did the clause have on federal courts' exercise of personal jurisdiction or Congress's ability to expand it?  There are relatively few cases from our nation's early constitutional history to serve as waypoints on our interpretive voyage.[16]  In any event, "[s]howing that Founding-era due process *didn't* limit federal personal jurisdiction is an exercise in proving a negative."  Stephen E. Sachs, *The Unlimited Jurisdiction of the Federal Courts*, 106 Va. L. Rev. 1703, 1710 (2020); *see also Elkins v. United States*, 364 U.S. 206, 218 (1960) ("[A]s a practical matter it is never easy to prove a negative . . . .").  And the majority opinion points us to no case whatsoever from our nation's early history to carry its burden in support of its view.  Nor could it: the few relevant cases that we have compellingly suggest that due process had precious little to do with jurisdiction.

1.

Consider *Picquet v. Swan*, 19 F. Cas. 609 (C.C.D. Mass. 1828) (No. 11,134).  Antonio Picquet, a Frenchman, sued James Swan, an American expatriate in Paris, in federal court.  *Id.* at 609.  Swan never appeared, so Picquet sought a default judgment.  But Justice Joseph Story, riding circuit,

---

Government, U.S.C. LV, LVI (2006)); *see also* Crema & Solum, *supra*, at 506–07 (noting that New York's 1788 ratification letter—the only one to request a "due process of law" guarantee—was likely "the inspiration for James Madison's decision to include the Due Process of Law Clause").  The lack of debate during the Constitution's framing and ratification is likely due to the fact that 'due process' was well understood at the time as having "a precise technical import" that was, well, beyond debate.  *See* Alexander Hamilton, *New York Assembly. Remarks on an Act for Regulating Elections* (Feb. 6, 1787), *reprinted in* 4 The Papers of Alexander Hamilton 34–37 (ed. Harold C. Syrett 1962).

[16] The reason for that, in part, is strict Congressional control over venue for federal civil suits.  *See, e.g.*, Judiciary Act of 1789, ch. 20, § 11, 1 Stat. 73, 79.  This necessarily limited the occasions that could give rise to jurisdictional issues.

refused to authorize such "upon the ground[] that there ha[d] been no sufficient service of the process." *Id.* at 619. The problem, Justice Story explained, was that Congress had not authorized extraterritorial process *clearly enough* to overcome the "general principle[]," in keeping with the "law of nations," "that a court created within and for a particular territory is bounded in the exercise of its power by the limits of such territory." *Id.* at 611, 615.

But Congress could have done so. Indeed, Congress *had* expressly authorized more expansive nationwide process in special circumstances, and having done so, Congress itself evidently acknowledged that it legislated against a restrictive background rule that constrained a federal court's process to its own particular district. *Id.* at 611 (noting examples). Relying both on this "understanding of congress" and "on general principles" of law, Justice Story repudiated a default rule that would permit "an alien, who has never been within the United States" to be "served with a summons or other process by any attachment of his property . . . and be bound thereby to appear and submit to the jurisdiction of [an American federal] court." *Id.* at 615.

If there were a moment in the opinion to mention any lurking Fifth Amendment due process issue, this would have been it.[17] Had Justice Story thought that a *constitutional* provision—not merely a defeasible background principle of the law of nations—demanded narrow statutory construction, "it would have been the simplest thing for him to say so." *See United States v. Zubaydah*, 142 S. Ct. 959, 992 (2022) (Gorsuch, J., dissenting). "Not only do universal principles of law preclude extraterritorial federal court

---

[17] Sachs, *supra*, at 1716 (discussing this part of *Picquet* and noting that if exercising extraterritorial jurisdiction over foreign defendants violated due process—in addition to common-law and general principles of justice—then "now was the time to say so").

process," Justice Story might very well have written, "but our own Constitution's Fifth Amendment prohibits it as violative of due process of law." He wrote no such thing, of course—and this is the dog that did not bark.[18] *See id.* at 992 (Gorsuch, J., dissenting) (making the same form of argument based on the "clear implication" of judicial silence)

But Justice Story went even further. He *expressly* contemplated the possibility of vast—perhaps unlimited—federal court jurisdiction, provided that Congress clearly said so: "If congress had prescribed such a[n] [expansive] rule, the court would *certainly be bound* to follow it . . . ." *Id.* (emphasis added).[19] Surely Justice Story would not have said that federal courts would "certainly" be "bound" to exercise constitutionally problematic jurisdiction merely upon Congressional say-so. To the contrary, he would have flagged any extrinsic constitutional limits on federal court jurisdiction that would have defeated overly expansive Congressional authorization. After all, whenever an act of Congress and the Constitution conflict, courts are obviously bound to obey the latter. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

But again, Justice Story conspicuously said nothing of this sort. And what he *did* say strongly suggests the *absence* of constitutional constraints on Congress's ability to authorize sweeping federal court jurisdiction over even foreign parties residing abroad. In the course of addressing Piquet's argument that the Judiciary Act of 1789 posed no barrier to extraterritorial

---

[18] *See* Sir Arthur Conan Doyle, *The Adventure of Silver Blaze*, Strand Mag., Dec. 1892, at 645, 656–57, 659 (mystery-solving clue was the "curious incident" of the dog that "did nothing in the night-time").

[19] *See also Piquet*, 19 F. Cas. at 613 ("*[I]ndependent of some positive provision to the contrary*, no judgment could be rendered in the circuit court against any person, upon whom process could not be personally served within the district." (emphasis added)).

process, Justice Story observed that Picquet relied on an unspoken—and incorrect—premise: namely, that absent affirmative statutory *limitations*, the reach of federal process was unbounded. *Piquet*, 19 F. Cas. at 613. Justice Story held the inverse to be true: absent affirmative *authorization*, the reach of American courts' process was limited by "general principles of law." *Id.* at 611, 615.

As Justice Story saw it, the "general principles of law" that gave rise to the background presumption against extraterritorial process were not a brooding omnipresence that indefeasibly tied Congress's hands. Congress could act to change the background rule. It just had to do so explicitly. Thus, Justice Story wrote that although "repugnant to the general rights and sovereignty of other nations" and not an intention to be presumed lightly from general congressional language, "a subject of England, or France, or Russia, having a controversy with one of our own citizens, *may* be summoned from the other end of the globe to obey our process, and submit to the judgment of our courts," if Congress's intent is "established by irresistible proof." *Id.* at 613. Importantly, Justice Story made no mention of Fifth Amendment due process.

But there *was* a *different* constitutional problem with Picquet's case. Picquet, it turns out, had described Swan as being "of the city of Boston, in the commonwealth of Massachusetts, one of the United States of America, and a citizen *of the said United States*." *Id.* at 609 (emphasis added). He did not, however, specify that Swan was "a citizen *of Massachusetts*, or of any particular state." *Id.* at 616 (emphasis added). And while the Judiciary Act of 1789 gave circuit courts jurisdiction over cases to which "an alien" like Piquet "is a party," 1 Stat. at 78, § 11, Article III of the Constitution "does not extend the judicial power of the United States to [*all* cases in which an alien is a party], but limits it to controversies between *citizens of a state*, and

foreign citizens or subjects." *Picquet*, 19 F. Cas. at 616 (paraphrasing U.S. Const. art. III, § 2) (emphasis added).

So, Justice Story pedantically engaged in constitutional avoidance to dodge this rigidly formalistic Article III problem. He interpreted the Judiciary Act to mean that "if an alien is one party, a citizen of some particular state must be the other party." *Id.* at 616. Picquet's writ technically did not pass muster because Picquet had not (in so many words) denominated his counterparty, Swan, a "citizen of *a state*"—a fact necessary for the court to exercise diversity jurisdiction according to the letter of the Constitution. If Justice Story was so attuned to this picayune constitutional peccadillo, could he really have overlooked a looming Fifth Amendment due process problem?

Justice Story's failure to make any mention of the Fifth Amendment's Due Process Clause would be glaring *if* Justice Story believed that it constrained courts' exercise of personal jurisdiction. But his omission makes perfect sense if the Clause merely required lawful process in keeping with the common law or duly enacted legislation.

2.

*Picquet*'s silence as to due process is telling. And it does not stand alone. Of the other early cases that we have, none lends support to the view that a string of Supreme Court cases interpreting the Fourteenth Amendment from the mid-twentieth century to the present somehow captured the Fifth Amendment's original public meaning. Just the opposite. Other cases both before and after *Picquet* suggest—in what they *do not* say— that Fifth Amendment due process had no bearing on the extent to which Congress could authorize federal courts to issue process internationally.

A decade before *Picquet*, Justice Bushrod Washington (President George Washington's nephew) already aired much the same reasoning while

riding circuit in Pennsylvania. In *Ex parte Graham*, which Justice Story cited favorably in *Picquet*, Justice Washington determined that a Philadelphia merchant was improperly arrested in Pennsylvania on the basis of a Rhode Island circuit court order. 10 F. Cas. 911, 911, 913 (C.C.E.D. Pa. 1818) (No. 5,657). "In the exercise of a jurisdiction over persons not inhabitants of, or found within the district where the suit is brought," he wrote, "there are difficulties, which, in the opinion of the court, *nothing but an act of congress can remove.*" *Id.* at 913 (emphasis added). And furthermore, he added,

> should it be the will of congress to vest in the courts of the United States an extra-territorial jurisdiction in prize causes, over persons and things found in a district other than that from which the process issued, it would seem to be proper, if not absolutely necessary, at the same time to prescribe the mode of executing the process.

*Id.* Congress had the power; it simply had to exercise it. And if there were any due process limitations on Congress's power, Justice Washington wholly neglected to mention them.

A decade after *Picquet*, the full Supreme Court endorsed Justice Story's circuit court opinion. *Toland*, 37 U.S. (13 Pet.) at 328, 330. In *Toland*, Justice Barbour described "the reasoning in [*Picquet*], generally, as having great force," and announced that the Court had "arrived at the same conclusions" as Justice Story had in *Picquet*. *Id.* at 328, 330. Toland, a Pennsylvanian plaintiff, sued Sprague, an American denizen of Gibraltar, for stiffing him on a shipment of tobacco and miscellaneous other goods. *Id.* at 302. As in *Picquet*, the question raised was "whether the process of foreign attachment can be properly used by the circuit courts of the United States, in cases where the defendant is domiciled abroad, and not found within the district in which the process issues, so that it can be served upon him." *Id.* at 327. Hewing closely to Justice Story's logic in *Picquet*, the Court held that

Congress's Process Acts, read in light of the Judiciary Act, had not expressly given federal courts the authority to cause process to be personally served upon foreign defendants abroad. *Id.* at 327–30. But, just as in *Picquet*, the Court intimated that express, "special authority of law"—"positive legislation"—*could* grant federal courts that power and thus expand their jurisdiction. *Id.* at 329–30.

Foreign attachment was not invariably doomed for lack of congressional authorization. In a couple other early nineteenth-century cases before *Picquet*, Justice Washington, riding circuit in Pennsylvania, refused to uphold challenges to foreign attachments against a Cantonese tea merchant on claims arising out of business conducted in Canton. *See Fisher v. Consequa*, 9 F. Cas. 120, 121–22 (C.C.D. Pa. 1809) (No. 4,816) (finding "no ground to dissolve [a foreign] attachment," as authorized by a colonial Pennsylvanian law, because that law "has received in practice a liberal construction, so as to embrace debts contracted in foreign countries, by persons who never did reside here, and who, of course, could not properly be said to absent themselves; and which debts, neither by the terms of the contract, nor by the removal of the debtor hither, could be said to be owing here"); *id.* at 121 (noting that the state law providing for foreign attachment was a "remedial law" that "ought . . . to be so extended as to remove the mischief [of absconding foreign debtors], and to advance the remedy" for the "injury of the inhabitants of Pennsylvania"); *Willings v. Consequa*, 30 F. Cas. 52, 52–55 (C.C.D. Pa. 1815) (No. 17,766) (failing to mention any jurisdictional issue with a series of suits brought by American merchants against a Cantonese merchant on parole contracts "made at Canton" for the delivery of tea to Amsterdam). Perhaps these cases would have come down differently in light of *Picquet* and *Toland*. But, for our purposes, the key thing to notice is that neither opinion so much as hints at a constitutional due process problem.

No. 20-30382
c/w No. 20-30379

From this brief survey of nineteenth-century case law, a couple of things are reasonably clear: First, so long as a statute or rule provides a means of serving process on civil defendants—even defendants halfway across the globe—a federal court could and should exercise jurisdiction, despite offending the law of nations. Second, so long as Congress expressly authorized such expansive process, Fifth Amendment due process does not impose constitutional limits on federal courts' exercise of personal jurisdiction. Just as Magna Carta's *per legem terrae* clause did not tie Parliament's hands in *Paty*'s case, early American cases show—by what they omit—that the Fifth Amendment's Due Process Clause does not restrict Congress's ability to prescribe, by law, the extent to which federal courts may issue process and thereby acquire personal jurisdiction over even foreign defendants a world away.

## C.

The majority opinion hopscotches right over all this history, leaping from Runnymede in 1215 A.D. straight to Washington, D.C. in 1945. *Ante* at 14–15. It turns out, as we have seen, that a good bit happened in the intervening seven centuries that is helpful to discerning what the Fifth Amendment's Due Process Clause, as originally understood, had to say about personal jurisdiction. *Supra* sections II.A–B. But on the majority opinion's abridged telling of the story, "the Great Charter of individual liberty, Magna Carta" gave rise to "due process of law," and (seven centuries later), *International Shoe* and its progeny suddenly elucidated how due process protects individual liberty vis-à-vis personal jurisdiction.[20] *Ante*

---

[20] I agree, of course, with the majority opinion that 'due process of law' protects individual liberty. *Ante* at 14–17. But so does federalism. *See, e.g.*, *Planned Parenthood Gulf Coast, Inc. v. Phillips*, 24 F.4th 442, 450 (5th Cir. 2022) ("Federalism recognizes our dual sovereignties—the states and the federal government—and 'secures to citizens the liberties that derive from the diffusion of sovereign power.'" (quoting *Shelby County v.*

No. 20-30382
c/w No. 20-30379

at 14–15.  As the majority opinion would have it, *International Shoe et al.*—an extensive line of Fourteenth Amendment case law—apply equally to Fifth Amendment due process, because both "Due Process Clauses use the same language and guarantee individual liberty in the same way."  *Ante* at 17.

This is anachronism.[21]  Case law applying the Fourteenth Amendment construes a different text directed at a different audience, and which was written at a different time in our history and, accordingly, under different circumstances.  To imbue the older Fifth Amendment with newer glosses on

---

*Holder*, 570 U.S. 529, 543 (2013))); *Williams ex rel. J.E. v. Reeves*, 981 F.3d 437, 439 (5th Cir. 2020) (Jones, J., dissenting) ("Federalism, the principle of dual sovereignties, is a bedrock principle of our Founding and a bulwark of individual liberty because it diffuses the exercise of power by governments.").  And so does the separation of powers.  *See Bond v. United States*, 564 U.S. 211, 222 (2011) ("The structural principles secured by the separation of powers protect the individual as well.").  Indeed, our entire system of government was designed to promote ordered liberty.  Yet it is equally clear that not every safeguard of our liberty comes in the form of an inflexible right against the state.  Federalism, for instance, protects individual liberty *structurally* by preventing dangerous concentrations of power.  Among its many other functions, Fifth Amendment due process likewise protects liberty by guaranteeing that deprivations thereof *only* occur pursuant to the law of the land—which includes statutes and rules that define and delimit federal courts' jurisdictional reach.  *Cf. Sachs*, Pennoyer *Was Right*, *supra*, at 1314 ("[D]ue process requires jurisdiction, full stop[] . . . .  To the extent that Congress has enumerated power to determine [federal courts' jurisdiction], the Due Process Clauses won't stand in the way."); *id.* at 1288 (explaining that because (1) "[d]ue process . . . forbid[s] deprivations of liberty or property without the lawful judgment of a properly authorized court," and (2) "a court lacking in personal jurisdiction isn't properly authorized [and] can't issue a lawful judgment," therefore, (3) an unlawful judgment from a court lacking personal jurisdiction constitutes a due process violation).

[21] It also begs the question.  The Fifth Amendment only protects individual liberty in the same way as the Fourteenth Amendment if we apply the same precedents from the Fourteenth Amendment context in the Fifth Amendment context—which is precisely the conclusion that the statement is supposed to explain.  *See ante* at 17 ("Because the Due Process Clauses use the same language and guarantee individual liberty in the same way, it makes sense that the standards developed in the Fourteenth Amendment context must govern under the Fifth Amendment.").

No. 20-30382
c/w No. 20-30379

the more recent Fourteenth Amendment is to put new wine in an old wineskin.[22]

1.

The Fourteenth Amendment was drafted more than seventy-five years after Fifth Amendment, and under quite different historical circumstances. As already discussed, recent originalist scholarship indicates that the phrase "due process of law" underwent substantial linguistic drift over the course of the nineteenth century. *See* Crema & Solum, *supra*, at 509–25; *supra* section II.A & n.8. In 1791, the phrase bore a rather technical legal meaning: namely, service of the proper writ—what we call "service of process" today. But by 1868, "due process of law" had come to refer to procedural fairness more generally. For this reason, Supreme Court precedents interpreting "due process of law" as it was used in 1868 are not dispositive of the phrase's usage in the late eighteenth century.

Still, even if we were to assume *arguendo* that the Fifth and Fourteenth Amendment Due Process Clauses share identical *semantic* content, there remain deeper structural state–federal differences that significantly affect the clauses' legal effect.[23] *International Shoe* and its progeny are concerned not only with due process generally, but also with principles of interstate

---

[22] *See* Crema & Solum, *supra*, at 528 (stating that it is most consistent with public meaning originalism to hold the view that "the meaning of the two Clauses are independent of one another" and rejecting the reverse-incorporation view that "[r]atification of the Fourteenth Amendment implicitly amended the earlier Fifth Amendment Due Process of Law Clause").

[23] *Cf. Xitronix Corp. v. KLA-Tencor Corp.*, 916 F.3d 429, 442–43 (5th Cir. 2019) (Higginson, J.) (observing that although "the Supreme Court prefers to construe like text alike[,] [i]t has refused to give identical terms the same meaning . . . when contexts and considerations differ," and holding that the lack of "federalism concerns" present in a different context justified a different interpretation of the same statutory language).

federalism.  And principles of interstate federalism are irrelevant in the *Fifth* Amendment context of *federal* court personal jurisdiction.[24]

Federalism concerns animate the Supreme Court's jurisprudence on the jurisdictional limitations of the Fourteenth Amendment's Due Process Clause.  *See Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1030 (2021) (noting that "principles of 'interstate federalism'" are central to the Court's analysis of Fourteenth Amendment due process limitations on personal jurisdiction (quoting *World-Wide Volkswagen*, 444 U.S. at 293)).[25] To prevent competing assertions of state court jurisdiction within the federal system, the Supreme Court has fashioned rules under the Fourteenth Amendment to limit state courts to the exercise of general personal jurisdiction over corporate defendants that are incorporated in the state, house their "nerve center" there, or are otherwise "essentially at home" in the state.

These federalism concerns are entirely absent in the Fifth Amendment due process context.[26]  Since federal law applies uniformly and

---

[24] The textual differences between the amendments are also reflective of these deeper structural state–federal differences between the clauses' respective applications. *Contrast* U.S. Const. amend. XIV, § 1 ("[N]or shall any *State* deprive any person of life, liberty, or property, without due process of law[.]" (emphasis added)), *with* U.S. Const. amend. V ("No person shall be . . . deprived of life, liberty, or property, without due process of law[.]").

[25] *See also, e.g.*, *Bristol-Myers*, 137 S. Ct. at 1780 ("[R]estrictions on personal jurisdiction 'are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States.'" (quoting *Hanson v. Denckla*, 357 U.S. 235, 251 (1958))); *id.* at 1788 (Sotomayor, J., dissenting) ("The majority's animating concern, in the end, appears to be federalism . . . .").

[26] The United States, intervening in a case pending in the Second Circuit, very recently put it this way:

No. 20-30382
c/w No. 20-30379

what matters, ultimately, is the sovereignty of the United States, federal courts' personal jurisdiction can properly be much more expansive. As the United States Solicitor General recently argued before the Supreme Court, "the United States' constitutional powers and special competence in matters of foreign affairs and international commerce, in contrast to the limited and geographically cabined sovereignty of each of the several States, would permit the exercise of federal judicial power in ways that have no analogue at the state level." Brief of the United States as *Amicus Curiae* at 32, *Ford Motor Co.*, 141 S. Ct. 1017 (Nos. 19-368, 19-369), 2020 WL 1478612.

This all makes sense as a matter of first principles. Personal jurisdiction is anchored to the concept of sovereignty. *Cf. McIntyre*, 564 U.S. at 883–84 ("[J]urisdiction is in the first instance a question of authority rather than fairness[.]"). A court has personal jurisdiction over a defendant when the state, of which the court is an instrumentality, has sovereign power over a defendant, either generally or with respect to a particular transaction or occurrence. The Constitution's Due Process Clauses come into play indirectly. For a defendant to be "deprived of life, liberty, or property" with

---

[F]ederalism concerns do not apply to the federal government. Unlike a state, which is subject to "territorial limitations" on its power, *World-Wide Volkswagen*, 444 U.S. at 294, the United States has authority "to enforce its laws beyond [its] territorial boundaries," *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 248 (1991), *superseded by statute on other grounds*. And rather than the limited and mutually exclusive sovereignty of the several states, the federal government's sovereignty includes authority over foreign commerce and foreign affairs. Indeed, the United States' "powers of external sovereignty" and its ability to conduct its relationships with foreign actors are grounded in the United States' status in international law as an independent state. *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 318 (1936).

Brief of Intervenor–Appellant United States at 35–40, *Fuld v. Palestinian Liberation Org.* (2d Cir. June 24, 2022) (Nos. 22-76, 22-496).

No. 20-30382
c/w No. 20-30379

the constitutionally required "due process of law," a properly authorized court must have rendered a lawful judgment in the proper manner. *See* Sachs, Pennoyer *was Right*, *supra*, at 1314; Sachs, *Unlimited Jurisdiction*, *supra*, at 1726–27. A court is only properly authorized when it is enabled to partake of the state's sovereign power over the defendant. Without authority, the court's judgment is "waste paper," and execution of the judgment would be unconstitutional for lack of due process. *See Voorhees v. Jackson*, 35 U.S. (10 Pet.) 449, 469, 475 (1836).

Domestically, Fourteenth Amendment due process thus prevents states from unjustifiably trenching on others' sovereign prerogative to have their courts hear cases concerning defendants residing or doing business within state borders. *See Pennoyer v. Neff*, 95 U.S. 714, 732–33 (1877). Applicable to state action, and here, *interstate* action, the Fourteenth Amendment necessarily carries federalist cargo.

But in the international sphere, our Constitution dictates no particular ordering of relations with other countries. Rather, the Constitution assigns that job to Congress and the President. *See* U.S. Const. art. I, § 8, cl. 3 (congressional power to "regulate Commerce with foreign Nations"); *id.* art. I, § 8, cl. 10 (congressional power to "define and punish Piracies and Felonies committed on the high Seas, and Offenses against the Law of Nations"); *id.* art. I, § 8, cl. 11 (congressional power to "declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water"); *id.* art. II, § 2, cl. 1 (presidential designation as "Commander in Chief"); *id.* art. II, § 2, cl. 2 (presidential power "to make Treaties"). The Fifth Amendment, as originally understood, imposes no extrinsic constraint on our coordinate branches' exercise of their prerogatives to conduct foreign relations in and through federal courts. Congress can open the federal courthouse door to lawsuits against foreign defendants. The Executive can prosecute or sue foreign actors in federal courts. Because the Fifth

66

No. 20-30382
c/w No. 20-30379

Amendment, unlike the Fourteenth Amendment, applies to federal courts and is not shaped by principles of federalism, it poses no barrier.

2.

Dismissing the interstate federalism concerns that animate much of Fourteenth Amendment personal jurisdiction jurisprudence, the majority opinion leans heavily on the "individual liberty interest[s]" protected by due process to justify extending Fourteenth Amendment due process case law into the Fifth Amendment to protect a foreign corporation. *Ante* at 14–17. This amounts to an improper, unhesitating expansion of substantive due process.

As a preliminary matter, it is not entirely clear whether foreign defendants abroad have due process rights in the first place. On the one hand, the Supreme Court recently emphasized that "it is long settled as a matter of American constitutional law that foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 140 S. Ct. 2082, 2086 (2020) (citing, *inter alia*, *Boumediene v. Bush*, 553 U.S. 723, 770–71 (2008), *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265–75 (1990), and *Johnson v. Eisentrager*, 339 U.S. 763, 784 (1950) (opinion of Jackson, J.)).[27] On the other hand, as the majority opinion correctly notes, a slew of Fourteenth Amendment personal jurisdiction cases has, without question, accepted the premise that foreign corporations have due process rights as to personal jurisdiction. *Ante* at 7–8.

---

[27] *See also Hernandez v. United States*, 785 F.3d 117, 126 (5th Cir. 2015) (Jones, J., concurring) ("The Supreme Court [has] held . . . and has reiterated . . . that as a general matter aliens outside the sovereign territory of the United States are not entitled to Fifth Amendment rights." (citing *Johnson*, 339 U.S. at 782–85)); *Castro v. Cabrera*, 742 F.3d 595, 599 n.5 (5th Cir. 2014) (noting that *Johnson* "reject[ed] extraterritorial application of the Fifth Amendment").

No. 20-30382
c/w No. 20-30379

Absent Supreme Court resolution of this perplexing problem, the Supreme Court's Fourteenth Amendment cases suggest that, as to personal jurisdiction, foreign actors abroad do have rights under the United States Constitution, anomalous as that may be. *See, e.g.*, *Daimler*, 571 U.S. at 139–41; *Asahi*, 480 U.S. at 114–15.

For better or worse, the words "due process of law" as used in the Fourteenth Amendment have always had, or else have since acquired, a substantive aspect that was never borne by the words *per legem terrae* in Magna Carta or "due process of law" as they were used at the Founding. *See* Williams, *supra*, at 428–34 (tracing the history of "due process" to explain how the Fourteenth Amendment's Due Process Clause is substantive, whereas the Fifth Amendment's is not); *United States v. Vaello Madero*, 142 S. Ct. 1539, 1535 (2022) (Thomas, J., concurring) ("[T]he Fifth Amendment's text and history provide little support for modern substantive due process doctrine.").[28]   The liberty interest that the majority opinion expounds is substantive in character. *Ante* at 8, 24 (concluding that non-resident, non-consenting defendants have a liberty-based right of immunity from suit in United States federal court). *See generally* Wendy Collins Perdue, *Sin, Scandal, and Substantive Due Process: Personal Jurisdiction and* Pennoyer *Reconsidered*, 62 Wash. L. Rev. 479 (1987) (parsing the nature of the liberty interest at stake in the personal jurisdiction analysis under the Fourteenth Amendment and concluding that it is "a substantive due process

---

[28] *See also Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 847 (1992) ("[T]he guaranties of due process, though having their roots in Magna Carta's '*per legem terrae*' and considered as procedural safeguards 'against executive usurpation and tyranny,' have in this country become 'bulwarks also against arbitrary legislation.'" (quoting *Poe v. Ullman*, 367 U.S. 497, 541 (1961) (Harlan, J., dissenting))).

right").[29]  While the Supreme Court has instructed us that the Fourteenth Amendment protects substantive personal-jurisdiction rights, it has not done so with the Fifth Amendment, and extending such a right here does not comport with the Fifth Amendment's meaning at the Founding.

Of course, the Supreme Court has ascribed to the Fifth Amendment Due Process Clause a "substantive" facet alongside the Fourteenth Amendment. *See, e.g.*, *United States v. Salerno*, 481 U.S. 739, 746 (1987) (acknowledging "[s]o-called 'substantive due process'" under the Fifth Amendment); *Wright v. United States*, 302 U.S. 583, 607 (1938) (holding that "[t]he phrase 'due process' in the Fifth and Fourteenth Amendments has long since been expanded beyond its literal meaning of due procedure"). But the Supreme Court has also limited the expansion of "substantive due process" in recent decades. *See Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) (expressing "reluctan[ce] to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended"). If, as the majority opinion urges, we are to treat Fourteenth Amendment due process jurisprudence as equally applicable to Fifth Amendment due process, we ought to consider its limits, too.

In the seminal case of *Washington v. Glucksberg*, the Court outlined two limiting factors to assess when faced with a novel substantive due process claim: First, the "fundamental right" asserted must be, "objectively, 'deeply rooted in this Nation's history and tradition.'"  521 U.S. 702, 720–21 (1997) (quoting *Moore v. City of E. Cleveland*, 431 U.S. 494, 503 (1977)).  And second,

---

[29] *See also* Jay Conison, *What Does Due Process Have to Do with Jurisdiction?*, 46 Rutgers L. Rev. 1071, 1158, 1192–99, 1209 (1994) ("The constitutional law of personal jurisdiction is a hodge-podge of nineteenth-century natural justice and natural rights, early twentieth-century substantive due process, and general law.").

the "asserted fundamental liberty interest" must be amenable to a "careful description." *Id.* at 527 (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)). We have adopted and applied this framework. *See Malagon de Fuentes v. Gonzales*, 462 F.3d 498, 505 (5th Cir. 2006) ("To establish a substantive due process violation, a plaintiff must first both carefully describe that right and establish it as 'deeply rooted in this Nation's history and tradition.'" (quoting *Glucksberg*, 521 U.S. at 720–21)); *see also Cantu-Delgadillo v. Holder*, 584 F.3d 682, 687 (5th Cir. 2009).

In considering whether to introduce into Fifth Amendment Due Process Clause jurisprudence a novel substantive due process right to immunity from personal jurisdiction in federal court, we ought to follow the *Glucksberg* framework. And that framework clearly precludes the majority opinion's expansion of substantive due process by "reverse incorporating" Fourteenth Amendment case law into the Fifth Amendment.

Taking the second factor first, the right that the majority opinion asserts in the name of individual liberty is not amenable to a clear and limited description. The Supreme Court itself has wavered in its articulation of the liberty interest at stake in its Fourteenth Amendment cases and has frequently discussed the issue in terms of "interstate federalism."[30] Case

---

[30] *Compare, e.g.*, *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982) ("The personal jurisdiction requirement recognizes and protects an individual liberty interest."), *with Hanson*, 357 U.S. at 251 (noting that limits on personal jurisdiction are ultimately a "consequence of territorial limitations on the power of the respective States"), *Bristol-Myers*, 137 S. Ct. at 1780 (same), *and World–Wide Volkswagen*, 444 U.S. at 293 ("The sovereignty of each State . . . implie[s] a limitation on the sovereignty of all its sister States . . . ."). Scholars too have puzzled over the exact nature of the right that the Court's twentieth-century Fourteenth Amendment jurisprudence has wrought. *See, e.g.*, Perdue, *Sin, Scandal, and Substantive Due Process*, *supra*, at 511–19; Conison, *supra*, at 1187–1203.

law in this area is highly fact-specific,[31] and the Supreme Court itself has recognized that delimiting defendants' "liberty interest[s]" vis-à-vis personal jurisdiction "necessarily requires determinations 'in which few answers will be written in black and white. The greys are dominant and even among them the shades are innumerable.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471, 486 n.29 (1985) (quoting *Kulko v. Super. Ct. of Cal.*, 436 U.S. 84, 92 (1978)). It can hardly be said, therefore, that the right of immunity that the majority opinion inserts into the Fifth Amendment is clearly delimited.

The bigger problem for the majority opinion, though, is *Glucksberg*'s central requirement that newly posited substantive due process rights be objectively deeply rooted in our Nation's history and traditions. 521 U.S. at 720–21. As already discussed at length, *supra* sections II.A–B, longstanding English and antebellum American legal history show that "due process of law" was not considered to impose substantive limits on the legislative body's ability to expand or contract courts' jurisdiction. Rather, centuries of tradition appear to support the view that even the most "repugnant" exercise of jurisdiction over defendants halfway across the globe could very well be authorized by Congress. *See Picquet*, 19 F. Cas. at 613. While there is, of course, a considerable tradition rooted in natural law and the law of nations against expansive extraterritorial exercises of jurisdiction, it is not the role of

---

[31] *See, e.g.*, *Polythane Sys. v. Marina Ventures Int'l, Ltd.*, 993 F.2d 1201, 1207 (5th Cir. 1993) ("Determinations regarding the exercise of personal jurisdiction over non-resident defendants must be made on a case-by-case basis."); *Walker v. Newgent*, 583 F.2d 163, 168 (5th Cir. 1978) ("Of necessity, inquiries into whether the exercise of personal jurisdiction is permissible in a particular case are sensitive to the facts of each case."); *accord uBID, Inc. v. GoDaddy Group, Inc.*, 623 F.3d 421, 433 (7th Cir. 2010) ("[T]his is a field of law where the Supreme Court has repeatedly refused opportunities to draw such bright lines.").

No. 20-30382
c/w No. 20-30379

the federal judiciary to constitutionalize such under the auspices of 'due process.'[32]

3.

Emphasizing defendants' "individual liberty" interests, *ante* at 14–17, raises another big problem for the majority opinion: Both historically and to the present day, foreign *criminal* defendants have been subjected to federal courts' jurisdiction for crimes committed abroad. This, despite the fact that criminal defendants, whose liberty—and very lives—are on the line, are always entitled to the very strictest due process rights. *See infra* section IV.D.1. The majority opinion wholly neglects to explain why it elevates foreign *civil* defendants above criminal defendants for special due-process solicitude in this context.

Since at least the seventeenth century, English and early American jurisprudence has expressly allowed criminal prosecutions of foreign actors for foreign conduct in domestic courts. In the 1820 case of *United States v. Smith*, Justice Story considered English criminal prosecutions from the late 1690s and early 1700s to be "entitled to great consideration" because of the "universal approbation of the legal principles asserted by them." 18 U.S. (5 Wheat.) 153, 177–80 n.h (1820) (citing *Rex v. Dawson*, 13 How. St. Tr. 451, 454–55 (1696), and *Rex v. Kidd*, 14 How. St. Tr. 123, 147, 180–83 (1701)). Notably, he found it "worthy of remark, that in *none* of these indictments was there any averment that the prisoners were British subjects; and most of them were for piracies committed on *foreign* subjects and vessels." *Id.* (emphases

---

[32] *Contra* Lea Brilmayer, *Jurisdictional Due Process and Political Theory*, 39 U. Fla. L. Rev. 293, 313 (1987) (noting the dubious judicial "legitimacy of relying upon natural law arguments" to support limits on personal jurisdiction, but suggesting that they might instead, "with some plausibility, be attributed to the constitutional text," which is "after all, . . . rather vague").

added).[33]   In other words, there was no jurisdictional problem with prosecuting possible foreigners in domestic court for foreign conduct that injured other foreigners.  Even when nothing about the criminal, the crime, or the victim has anything to do with the forum, English courts could hear and adjudicate the prosecutions.  Due process interposed no jurisdictional barrier.

In contemporary due process jurisprudence, we and our sister circuits merely require that when the United States prosecutes a non-citizen for foreign conduct there must be "a sufficient nexus between the conduct condemned and the United States" such that it "would not be arbitrary or fundamentally unfair" for our courts to enter judgment against the defendant.  *See United States v. Rojas*, 812 F.3d 382, 393 (5th Cir. 2016) (quoting *United States v. Lawrence*, 727 F.3d 386, 396 (5th Cir. 2013)); Restatement (Fourth) of Foreign Relations Law § 403(c) & n.4 (2018) (citing sister circuit cases).  And "a jurisdictional nexus exists when the aim of that activity"—or perhaps merely its effect—"is to cause harm inside the United States or to U.S. citizens or interests."  *See id.* (quoting *United States v. Al Kassar*, 660 F.3d 108 (2d Cir. 2011)); *United States v. Murillo*, 826 F.3d 152, 157 (4th Cir. 2016) ("[I]t is not arbitrary to prosecute a defendant in the United States if his 'actions affected significant American interests'—even if the defendant did not mean to affect those interests." (quoting *United States v. Brehm*, 691 F.3d 547, 552–53 (4th Cir. 2012))).

---

[33] Indeed, in the cited 1696 English case of *Rex v. Dawson*, the jury instructions of the presiding Sir Charles Hedges, the Judge of the High Court of Admiralty, indicated that the extraterritorial piracy prosecution was "cognizable of th[at] Court" because "[t]he King of England hath not only an empire and sovereignty over the British seas" for "the punishment of piracy," but also "an undoubted jurisdiction and power" in "the most remote parts of the world."  13 How. St. Tr. at 455.

No. 20-30382
c/w No. 20-30379

So, even though due process today places more limits perhaps on federal courts' *criminal* jurisdiction than there were historically, this "more expansive due process test in criminal cases" is hardly as constraining as the test that the majority opinion today demands in the *civil* context. *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 340 (2d Cir. 2016). Thus, our sister circuits have unhesitatingly affirmed convictions in federal district court of Somali pirates for murders committed some thirty nautical miles off the Somali coast, a Spanish illegal weapons trafficker for deals brokered in Spain and Beirut, a Colombian taxicab driver for murdering an undercover American DEA special agent in Bogotá, and a leader of an extensive international criminal drug enterprise for funding terrorism—among others. *See, e.g.*, *United States v. Beyle*, 782 F.3d 159, 165–69 (4th Cir. 2015) (opinion of Wilkinson, J.); *Al Kassar*, 660 F.3d at 117–20 (opinion of Jacobs, C.J.); *Murillo*, 826 F.3d at 153–54, 156–57; *In re Sealed Case*, 936 F.3d 582, 593–94 (D.C. Cir. 2019) (opinion of Griffith, J.).[34]

The bottom line is this: We can prosecute foreign pirates, arms traffickers, murderers, and terrorists in our federal courts for criminal conduct abroad; we can condemn them to life imprisonment; we can sentence them even to death; but we *cannot*, on the majority opinion's reasoning, subject them to *civil* suit in United States federal courts without violating due process unless they are "at home" here (or the lawsuit arises out of their purposeful "minimum contacts" with the United States). It is nonsense on stilts to hold that allowing a civil lawsuit against a foreign defendant for foreign conduct violates due process but that a criminal prosecution against the *same* defendant for the *same* foreign conduct does not.

---

[34] *See also, e.g.*, *United States v. Shibin*, 722 F.3d 233 (4th Cir. 2013); *United States v. Dire*, 680 F.3d 446 (4th Cir. 2012); *Brehm*, 691 F.3d at 552–54; *United States v. Ali*, 718 F.3d 929, 944–47 (D.C. Cir. 2013).

No. 20-30382
c/w No. 20-30379

The Fifth Amendment does not compel us to pronounce such absurdity. As originally and subsequently understood, its Due Process Clause imposes no stricter limit on personal jurisdiction in civil cases than it does in criminal prosecutions; indeed, it imposes *no* limit on Congress's ability to extend the range of federal courts' civil process. *See supra* sections II.A–B.

## D.

That the Fifth Amendment's Due Process Clause, as originally understood, imposes no direct constraint on Congress's ability to demarcate the extent of federal courts' power is not necessarily to say that it imposes no constraints whatsoever. Indeed, the Due Process Clause secures individual liberty not just by requiring that "courts have jurisdiction, period." Sachs, *Unlimited Jurisdiction*, *supra*, at 1712 (emphasis removed); *supra* n.20. In my view, it also ensures the rule of law more broadly by guarding against arbitrary, capricious, and *ad hoc* government action.

In the context of personal jurisdiction, arbitrary modes of process or nefarious allocations of judicial authority designed to frustrate notice and fair hearing would certainly violate the Due Process Clause. *See* Sachs, *Unlimited Jurisdiction*, *supra*, at 1740. Take the fair-hearing requirement, for example. "Congress could violate the due process clause by requiring all federal cases to be tried in Adak (the westernmost settlement in the Aleutian Islands)," because the arbitrarily distant forum "make[s] the offer of adjudication a mirage." *Bd. of Trs., Sheet Metal Workers' Nat. Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031, 1036 (7th Cir. 2000) (Easterbrook, J.).

Now consider the fair notice requirement. Imagine a hypothetical Rule 4(k)(3), which says: "Constructive service of process by posting a complaint and summons in pig Latin on the Court-House door on the island of Tobago establishes personal jurisdiction over any named defendant in any federal district court." This too would obviously founder on Fifth

75

Amendment due process grounds. *See Potter v. Castle Const. Co.*, 355 F.2d 212, 215 (5th Cir. 1966) ("[D]ue process under the Fifth Amendment . . . [requires] 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314–315 (1950))).

## III.

What does the original understanding of the Fifth Amendment's Due Process Clause mean for these cases before us? The answer is really quite simple: the plaintiffs' cases should go forward. Because the Fifth Amendment's Due Process Clause, as originally understood, poses no extrinsic limit on Congress's ability to authorize expansive personal jurisdiction in federal courts, the district court had personal jurisdiction over NYK pursuant to Rule 4(k)(2).[35]

The majority opinion instead holds that the Fifth Amendment protects corporate defendant NYK against the "concrete burden of 'litigating in a distant or inconvenient forum' and the abstract burden of 'submitting to the coercive power of a [forum] that may have little legitimate interest in the claims in question." *Ante* at 15 (quoting Fourteenth Amendment cases *World-Wide Volkswagen*, 444 U.S. at 291, and *Bristol-Myers*, 137 S. Ct. at 1781). Even if, *arguendo*, we were to accept as true the existence of these substantive due process rights, in what way does litigating

---

[35] Incidentally, the majority opinion quotes with approval the D.C. Circuit's suggestion that "[a]pplying consistent personal-jurisdiction standards under the Fifth and Fourteenth amendments is . . . easier to administer." *Ante* at 20–21 (quoting *Livnat v. Palestinian Auth.*, 851 F.3d 45, 55–56 (D.C. Cir. 2017)). Easier still, I would suggest, is simply applying the Fifth Amendment as originally understood.

No. 20-30382
c/w No. 20-30379

in the United States burden NYK? Put another way, how has NYK's liberty actually been impinged?

Recall that NYK is a massive multinational corporation—one of the largest shipping and logistics companies in the world. And like any modern multinational conglomerate, NYK is the consummate cosmopolitan: the world is its home. Although formally headquartered in Japan, NYK is perfectly at home here in the United States.[36]

NYK is no stranger to our shores: Its ships regularly call on at least thirty United States ports,[37] averaging about 1,500 calls annually—more than four calls per day. In a highly fragmented market, it ranked tenth in United States containerized export trade and twelfth in import trade in 2013. Part of its fleet does nothing but deliver cars to the United States. NYK operates twenty-seven shipping terminals in United States ports and air-cargo service at six United States airports. Its employees work at the corporation's American subsidiaries. Shares of NYK stock are deposited at the Bank of New York Mellon and may be purchased by United States investors. All told, NYK reaps roughly $1.5 *billion* in annual revenue in North America.

---

[36] The majority opinion correctly cites *Daimler* to remind us that, under governing Fourteenth Amendment jurisprudence, the 'at home' test is "an inherently comparative inquiry." *Ante* at 26. And so it is. But, as this case shows, this "comparative inquiry," which focuses as much on a corporate defendant's immaterial foreign contacts as on its contacts with the United States, ultimately means that "too big to fail" multinational corporations are also "too big for general jurisdiction." *See Daimler*, 571 U.S. at 143 (Sotomayor, J., concurring in the judgment); *cf. id.* at 158 ("[This] proportionality approach will treat small businesses unfairly in comparison to national and multinational conglomerates. Whereas a larger company will often be immunized from general jurisdiction in a State on account of its extensive contacts outside the forum, a small business will not be.").

[37] The record indicates that NYK ships called on forty-one separate United States ports located along the east coast, west coast, and Gulf of Mexico between March 2019 and February 2020 alone.

77

No. 20-30382
c/w No. 20-30379

In the course of doing business here, NYK has frequently availed itself of the American legal system. The corporation has brought at least seventy-eight lawsuits in federal court since 1993 (almost three per year), thus invoking the power of our courts to demand over $22 million in damages.[38]

---

[38] *See* Complaint at 3–5, *Nippon Yusen Kabushiki Kaisha v. Riverside Navigation Ltd.*, No. 3:20-CV-00588 (M.D. La. Sept. 8, 2020), ECF No. 1 (breach of contract suit seeking over $3 million); Complaint at 45–47, *Nippon Yusen Kabushiki Kaisha v. Norfolk S. Ry. Co.*, No. 1:20-CV-00858 (D.D.C. Mar. 31, 2020), ECF No. 1 (antitrust violations under the Sherman Act and Clayton Act); Complaint at 30–32, *Nippon Yusen Kabushiki Kaisha v. BNSF Ry. Co.*, No. 1:20-CV-00790 (D.D.C. Mar. 23, 2020), ECF No. 1 (antitrust violations under the Sherman Act and Clayton Act); Complaint at 30–32, *Nippon Yusen Kabushiki Kaisha v. BNSF Ry. Co.*, No. 2:20-CV-02570 (D.N.J. Mar. 10, 2020), ECF No. 1 (antitrust violations under the Sherman Act and Clayton Act); Complaint at 1–3, *Nippon Yusen Kabushiki Kaisha v. Elite Int'l Corp. L.L.C.*, No. 1:18-CV-02640 (N.D. Ill. Apr. 12, 2018), ECF No. 1 (commercial maritime suit seeking almost $80,000); Complaint at 1–2, *Nippon Yusen Kabushiki Kaisha v. Pactrans Air & Sea, Inc.*, No. 1:18-CV-02331 (N.D. Ill. Mar. 30, 2018), ECF No. 1 (commercial maritime suit seeking almost $30,000); Complaint at 3–6, *Nippon Yusen Kabushiki Kaisha v. GSF Nut Co., LLC*, No. 2:17-CV-05614 (C.D. Cal. July 28, 2017), ECF No. 1 (commercial maritime suit seeking over $20,000); Complaint at 5–10, *Nippon Yusen Kabushiki Kaisha v. Multi-Trans Shipping Agency, Inc.*, No. 2:16-CV-09523 (C.D. Cal. Dec. 23, 2016), ECF No. 1 (commercial maritime suit seeking $50,000); Complaint at 4–10, *Nippon Yusen Kaisha v. BNSF Ry. Co.*, No. 2:16-CV-00208 (W.D. Wash. Feb. 11, 2016), ECF No. 1 (commercial dispute seeking damages or indemnification of up to $1 million); Complaint at 4–7, *Nippon Yusen Kaisha v. Global Fresh Inc.*, No. 2:15-CV-08907 (C.D. Cal. Nov. 16, 2015), ECF No. 1 (commercial maritime suit seeking over $35,000); Complaint at 4–7, *Nippon Yusen Kaisha v. Best Global Logistics USA, Inc.*, No. 2:15-CV-08540 (C.D. Cal. Nov. 2, 2015), ECF No. 1 (commercial maritime suit seeking over $675,000); Complaint at 2–3, *Nippon Yusen Kaisha v. Lincoln Gen. Ins. Co.*, No. 1:15-CV-03231 (S.D.N.Y. Apr. 24, 2015), ECF No. 1 (bond dispute seeking almost $67,000); Complaint at 4–8, *Nippon Yusen Kaisha v. Staudt Int'l Servs. Corp.*, No. 2:15-CV-02516 (C.D. Cal. Apr. 6, 2015), ECF No. 1 (commercial maritime suit seeking over $32,000); Complaint at 3–5, *Nippon Yusen Kabushiki Kaisha v. Kraiem*, No. 2:15-CV-01364 (D.N.J. Feb. 23, 2015), ECF No. 1 (suit to obtain security against state-court judgment for up to $100,000); Complaint at 3–6, *Nippon Yusen Kaisha v. Wesmex Inc.*, No. 8:14-CV-01910 (C.D. Cal. Dec. 3, 2014), ECF No. 1 (commercial maritime suit seeking about $28,000); Complaint at 3–6, *Nippon Yusen Kaisha v. Am. Recreation Prods.*, No. 2:14-CV-08428 (C.D. Cal. Oct. 30, 2014), ECF No. 1 (commercial maritime suit seeking around $27,000); Complaint at 3–6, *Nippon Yusen Kaisha v. Pandol Assocs. Marketing, Inc.*, No. 2:14-CV-08055 (C.D. Cal. Oct. 17, 2014), ECF No. 1 (commercial maritime suit seeking

---

about $70,000); Complaint at 3–5, *Nippon Yusen Kaisha v. Infinity 8 Int'l Trade LLC*, No. 2:14-CV-03419 (C.D. Cal. May 2, 2014), ECF No. 1 (commercial maritime suit seeking approximately $57,000); Complaint at 2–4, *Nippon Yusen Kaisha v. Arch Ins. Co.*, No. 1:14-CV-01369 (S.D.N.Y. Feb. 28, 2014), ECF No. 2 (bond dispute seeking around $75,000); Complaint at 1–2, *Nippon Yusen Kaisha v. Latvian Am. Shipping Line Inc.*, No. 1:13-CV-04592 (S.D.N.Y. July 2, 2013), ECF No. 1 (breach of contract suit seeking almost $25,000); Complaint at 3–4, *Nippon Yusen Kaisha v. Millenium Plus, Inc.*, No. 2:13-CV-03029 (C.D. Cal. Apr. 30, 2013), ECF No. 1 (commercial maritime suit seeking about $32,000); Complaint at 4–6, *Nippon Yusen Kaisha v. Agape Int'l Shipping*, No. 2:12-CV-10068 (C.D. Cal. Nov. 26, 2012), ECF No. 1 (commercial maritime suit seeking about $42,000); Complaint at 1–2, *Nippon Yusen Kaisha v. Shiplane Transport, Inc.*, No. 2:12-CV-05951 (D.N.J. Sept. 21, 2012), ECF No. 1 (breach of contract suit seeking about $62,000); Complaint at 4–6, *Nippon Yusen Kaisha v. Air Sea Cargo Network, Inc.*, No. 2:12-CV-07790 (C.D. Cal. Sept. 11, 2012), ECF No. 1 (commercial maritime suit seeking about $17,000); Complaint at 1–2, *Nippon Yusen Kaisha v. FIL Lines USA Inc.*, No. 1:12-CV-06643 (S.D.N.Y. Aug. 30, 2012), ECF No. 1 (commercial maritime suit seeking almost $48,000); Complaint at 3–5, *Nippon Yusen Kaisha v. Cargo Int'l Forwarders & NVOCC, Inc.*, No. 2:12-CV-07266 (C.D. Cal. Aug. 23, 2012), ECF No. 1 (commercial maritime suit seeking about $22,000); Complaint at 3–5, *Nippon Yusen Kaisha v. Sunshine Shipping, Inc.*, No. 2:12-CV-05473 (C.D. Cal. June 22, 2012), ECF No. 1 (commercial maritime suit seeking over $151,000); Complaint at 3–5, *Nippon Yusen Kaisha v. TJD Int'l, Inc.*, No. 2:11-CV-07301 (D.N.J. Dec. 16, 2011), ECF No. 1 (breach of contract suit seeking over $110,000); Complaint at 1–3, *Nippon Yusen Kaisha v. Shiplane Transport, Inc.*, No. 1:11-CV-06327 (S.D.N.Y. Sept. 9, 2011), ECF No. 1 (indemnity suit seeking $60,000); Complaint at 4–10, *Nippon Yusen Kaisha v. BNSF Ry. Co.*, No. 2:11-CV-00978 (W.D. Wash. June 10, 2011), ECF No. 1 (commercial dispute seeking damages or indemnification of around $312,000); Complaint at 1–2, *Nippon Yusen Kaisha v. Summer Breeze Transport, Inc.*, No. 1:10-CV-22185 (S.D. Fla. July 2, 2010), ECF No. 1 (commercial maritime dispute seeking almost $287,000); Complaint at 5–10, *Nippon Yusen Kaisha v. BNSF Ry. Co.*, No. 2:10-CV-03190 (C.D. Cal. Apr. 28, 2010), ECF No. 1 (commercial dispute seeking damages or indemnification of around $3.16 million); Complaint at 1–2, *Nippon Yusen Kaisha v. Wing Lee Dev., Inc.*, No. 1:09-CV-09521 (S.D.N.Y. Nov. 16, 2009), ECF No. 1 (commercial maritime dispute seeking $24,540); Complaint at 1–2, *Nippon Yusen Kaisha v. Nick's Int'l Shipping, Inc.*, No. 1:09-CV-09520 (S.D.N.Y. Nov. 16, 2009), ECF No. 1 (commercial maritime dispute seeking just over $95,000); Complaint at 2, *Nippon Yusen Kaisha v. Triship Glob. Logistics, Inc.*, No. 1:09-CV-09519 (S.D.N.Y. Nov. 16, 2009), ECF No. 1 (admiralty suit seeking over $38,000); Complaint at 1–2, *Nippon Yusen Kaisha v. United Trans-Trade, Inc.*, No. 1:09-CV-09518 (S.D.N.Y. Nov. 16, 2009), ECF No. 1 (commercial maritime dispute seeking around $28,000); Complaint at 4–6, *Nippon Yusen Kaisha v. 817 Rolls Knitted Fabric 100% Poly Charmeuse*, No. 1:09-CV-05974 (S.D.N.Y. June 30, 2009), ECF No. 1 (*in rem* admiralty suit seeking around $85,000); Complaint at 1–3, *Nippon Yusen*

No. 20-30382
c/w No. 20-30379

———————

*Kaisha v. Baltic Auto Shipping, Inc.*, No. 1:09-CV-05698 (S.D.N.Y. June 22, 2009), ECF No. 1 (suit seeking around $250,000); Complaint at 3–5, *Nippon Yusen Kaisha v. Cargo Int'l Forwarders & NVOCC, Inc.*, No. 1:09-CV-05697 (S.D.N.Y June 22, 2009), ECF No. 1 (breach of contract suit seeking about $50,000); Complaint at 1–3, *Nippon Yusen Kaisha v. Green Vanderbilt Corp.*, No. 1:09-CV-04464 (S.D.N.Y. May 8, 2009), ECF No. 1 (breach of contract suit seeking around $85,000); Complaint at 1–3, *Nippon Yusen Kaisha v. JJB Trucking & Shipping Servs. Corp.*, No. 1:09-CV-04444 (S.D.N.Y. May 8, 2009), ECF No. 1 (breach of contract suit seeking around $14,000); Complaint at 1–3, *Nippon Yusen Kaisha v. Fish On Bait Co., LLC*, No. 1:09-CV-04443 (S.D.N.Y. May 8, 2009), ECF No. 1 (breach of contract suit seeking about $100,000); Complaint at 1–3, *Nippon Yusen Kaisha v. Seaspeed Overseas Shipping Co.*, No. 1:09-CV-04442 (S.D.N.Y. May 8, 2009), ECF No. 1 (breach of contract suit seeking roughly $18,000); Complaint at 1, *Nippon Yusen Kaisha v. Relampago Express Transportes*, No. 1:09-CV-04439 (S.D.N.Y. May 8, 2009), ECF No. 1 (breach of contract suit seeking around $35,000); Complaint at 1–3, *Nippon Yusen Kaisha Line v. EMU Lines PVT LTD.*, No. 1:09-CV-00665 (S.D.N.Y. Jan. 23, 2009), ECF No. 1 (breach of contract suit seeking around $33,000); Complaint at 2–4, *Nippon Yusen Kaisha v. TJD Int'l Inc.*, No. 2:08-CV-06349 (D.N.J. Dec. 24, 2008), ECF No. 1 (admiralty suit seeking around $500,000); Complaint at 2–4, *Nippon Yusen Kaisha v. Fortune Ocean Shipping Ltd.*, No. 1:08-CV-09887 (S.D.N.Y Nov. 14, 2008), ECF No. 1 (commercial maritime suit seeking about $200,000); Amended Complaint at 2–6, *Nippon Yusen Kaisha v. N. China Shipping Ltd. BHM*, No. 1:08-CV-09850 (S.D.N.Y Nov. 13, 2008), ECF No. 3 (commercial maritime suit seeking over $293,000); Complaint at 7–12, *NYK Line (N. Am.) Inc. & Nippon Yusen Kabushiki Kaisha v. New Amera Transit, Inc.*, 2:08-CV-05505 (D.N.J. Nov. 6, 2008), ECF No. 1 (breach of contract suit seeking $265,000); Complaint at 1–2, *Nippon Yusen Kaisha v. Plastic Nation Inc.*, No. 1:08-CV-06736 (S.D.N.Y July 29, 2008), ECF No. 1 (breach of contract suit seeking over $23,000); Complaint at 2–5, *Nippon Yusen Kaisha v. McDonough Indus. LLC*, No. 1:08-CV-03444 (S.D.N.Y Apr. 8, 2008), ECF No. 1 (breach of contract suit seeking attachment of up to $1.3 million); Complaint at 7–12, *NYK Line (N. Am.) Inc. & Nippon Yusen Kabushiki Kaisha v. BNSF Ry. Co.*, 2:08-CV-00320 (W.D. Wash. Feb. 22, 2008), ECF No. 1 (breach of contract suit seeking at least $130,000); Complaint at 1–2, *Nippon Yusen Kaisha v. Am. Heritage Furniture, Inc.*, No. 1:08-CV-00488 (S.D.N.Y Jan. 18, 2008), ECF No. 1 (breach of contract suit seeking about $30,000); Complaint at 1–2, *Nippon Yusen Kaisha v. Q.P.S. Materials, Inc.*, No. 1:08-CV-00487 (S.D.N.Y Jan. 18, 2008), ECF No. 1 (breach of contract suit seeking about $23,000); Complaint at 1–2, *Nippon Yusen Kaisha v. Yanfield Int'l Corp.*, No. 1:08-CV-00486 (S.D.N.Y Jan. 18, 2008), ECF No. 1 (breach of contract suit seeking about $25,000); Complaint at 1–2, *Nippon Yusen Kaisha v. Distrib. I (USA), Inc.*, No. 1:08-CV-00484 (S.D.N.Y Jan. 18, 2008), ECF No. 1 (breach of contract suit seeking almost $100,000); Complaint at 2, *Nippon Yusen Kaisha v. Freight Servs. of W. Coast Corp.*, No. 1:07-CV-07840 (S.D.N.Y Sept. 5, 2007), ECF No. 1 (breach of contract suit seeking just shy of $60,000); Complaint at 1–2, *Nippon Yusen Kaisha v. Fresh W. Exch.*, No. 1:07-CV-07839 (S.D.N.Y

Sept. 5, 2007), ECF No. 1 (breach of contract suit seeking over $36,000); Complaint at 1–2, *Nippon Yusen Kaisha v. Anderson Int'l Global, LLC*, No. 1:07-CV-07838 (S.D.N.Y Sept. 5, 2007), ECF No. 1 (breach of contract suit seeking around $170,000); Complaint, *Nippon Yusen Kaisha v. BNSF Ry. Co.*, No. 2:07-CV-02896 (C.D. Cal. May 2, 2007), ECF No. 1 (docket indicates demand for approximately $225,000); Complaint, *Nippon Yusen Kaisha v. BNSF Ry. Co.*, No. 2:07-CV-02417 (C.D. Cal. Apr. 11, 2007), ECF No. 1 (docket indicates demands for around $13,000); Complaint at 1–2, *Nippon Yusen Kaisha v. Zircon Logistics, Inc.*, No. 1:07-CV-02874 (S.D.N.Y. April 10, 2007), ECF No. 1 (breach of contract suit seeking $135,000); Complaint at 1–2, *Nippon Yusen Kaisha v. Air 7 Seas Trans Logistics*, No. 1:07-CV-02873 (S.D.N.Y Apr. 10, 2007), ECF No. 1 (breach of contract suit seeking $75,000); Complaint at 4–10, *Nippon Yusen Kaisha v. BNSF Ry. Co.*, 3:07-CV-00563 (N.D. Cal. Jan. 26, 2007), ECF No. 1 (commercial dispute seeking damages or indemnification of over $255,000); Amended Complaint at 5–10, *Nippon Yusen Kaisha v. BASF Corp.*, 3:06-CV-03704 (N.D. Cal. June 9, 2006), ECF 43 (suit seeking to avoid or limit liability for loss of goods in transit); Complaint at 6–11, *Nippon Yusen Kaisha v. BNSF Ry. Co.*, 3:05-CV-03609 (N.D. Cal. Sept. 7, 2005), ECF No. 1 (commercial dispute seeking damages or indemnification of over $6 million); Complaint, *Nippon Yusen Kaisha v. Union Pac. Ry. Co.*, 2:04-CV-08861 (C.D. Cal. Oct. 26, 2004), ECF No. 1; Complaint, *NYK Line (N. Am.) Inc. & Nippon Yusen Kaisha v. BNSF Ry. Co.*, 2:00-CV-02728 (C.D. Cal. Mar. 16, 2000), ECF No. 1 (docket indicates demand for around $411,000); Complaint, *Nippon Yusen Kaisha v. Bulktrans (Eur.) Corp.*, No. 1:00-CV-00573 (S.D.N.Y Jan. 27, 2000), ECF No. 1 (docket indicates demand for $500,000); Complaint, *Nippon Yusen Kaisha v. Kellaway Transp., Inc.*, No. 2:99-CV-01441 (D.N.J. Mar. 29, 1999), ECF No. 1; Complaint, *Trans-Pac. Policing Agreement & Nippon Yusen Kaisha, Ltd. v. U.S. Customs Serv.*, No. 1:97-CV-02188 (D.D.C. Sept. 22, 1997), ECF No. 1; Complaint, *Nippon Yusen Kaisha v. Velsicol Chem.*, 2:97-CV-03176 (C.D. Cal. Apr. 30, 1997), ECF No. 1 (docket indicates demand for roughly $168,000); Complaint, *Nippon Yusen Kaisha v. Atlantic Ro/Ro Carriers of Tex., Inc.*, No. 2:96-CV-04020 (D.N.J. Aug. 22, 1996), ECF No. 1 (docket indicates demand for around $2,000); Complaint, *Nippon Yusen Kaisha v. W. Ave. Serv.*, No. 1:96-CV-06137 (S.D.N.Y. Aug. 14, 1996), ECF No. 1 (docket indicates a demand for approximately $14,000); Complaint, *Nippon Yusen Kaisha v. Jeri-Jo Inc.*, 2:95-CV-06287 (D.N.J. Dec. 18, 1995), ECF No. 1 (docket indicates a demand of around $548,000); Complaint, *Nippon Yusen Kaisha v. Kellaway Transp. Inc.*, 2:95-CV-04349 (D.N.J. Aug. 16, 1995), ECF No. 1 (docket indicates a demand for approximately $131,000); Complaint, *Nippon Yusen Kaisha Line v. Packard Bell*, 2:94-CV-03484 (C.D. Cal. May 26, 1994), ECF No. 1; Complaint, *Am. President Lines, Ltd. & Nippon Yusen Kaisha, et al. v. Kirch Indus. Co.*, No. 1:93-CV-00497 (D.D.C. Mar. 9, 1993), ECF No. 1; *see also* Third-Party Complaint, *Tokio Marine & Fire Ins. Co., Ltd. v. M/V Joyous Age*, No. 1:03-CV-06346 (S.D.N.Y. Aug. 22, 2003), ECF 4; Third-Party Complaint, *Thyssen Krupp Steel v. M/V Andorinha*, No. 1:01-CV-04305 (S.D.N.Y. May 21, 2001), ECF No. 10; Third-Party Complaint, *Talatala v. Nippon Yusen Kaisma*, No. 1:94-CV-00340 (D. Haw. May 5, 1994), ECF No. 19 (party name spelled "*Kaisma*" rather

No. 20-30382
c/w No. 20-30379

It has quite regularly defended itself from suit here as well[39]—likely at its own invitation: NYK's bills of lading and sea waybills affirmatively select the Southern District of New York as the exclusive forum for all disputes thereunder.

It strains belief to suggest that the United States is really "a distant or inconvenient forum" for NYK or that NYK is abstractly burdened by "submitting to" United States federal courts' "coercive power."  For one thing, it is hardly too distant or inconvenient for NYK to do business here; why, then, is litigation here too distant and inconvenient?  It is hardly too distant or inconvenient for NYK to litigate here as a plaintiff; why, then, is it too distant and inconvenient as a defendant?  NYK clearly welcomes the opportunity to take advantage of the United States' robust marketplace, an economy fostered by the rule of law that our judicial system ensures, and the corporation freely avails itself of federal courts as a plaintiff.  Can NYK really complain about submitting to federal judicial power when NYK enjoys the security that that power provides?  And can NYK really argue that the United States has "little legitimate interest" in adjudicating claims brought

---

than "*Kaisha*" on the docket); Third-Party Complaint, *Okura & Co. (Am.), Inc. v. M.V. Yamataka Maru*, No. 1:92-CV-03783 (S.D.N.Y. May 26, 1992), ECF No. 6; Complaint at 4–5, *Nippon Yusen Kaisha v. Bankers Ins. Co.*, No. 8:19-CV-01343 (M.D. Fla. June 3, 2019), ECF No. 1-3 (removed from state court).

As matters of public record, complaints filed in federal court are properly subject to judicial notice.  *Ruiz v. Brennan*, 851 F.3d 464, 468 (5th Cir. 2017) ("[W]e may take judicial notice of matters of public record.").

[39] *Ante* at 4 n.4 (citing complaints filed against NYK in federal court).  NYK also pleaded guilty in 2014 to criminal antitrust charges for its conduct in shipping cargo "to and from the United States and elsewhere."  Information, *United States v. Nippon Yusen Kabushiki Kaisha* (D. Md. 2014) (alleging corporate violations of 15 U.S.C. § 1 (Sherman Act)); Plea Agreement at 2, 6, *United States v. Nippon Yusen Kabushiki Kaisha*, 1:14-CR-00612 (D. Md. Mar. 11, 2015), ECF No. 20 (agreeing to a fine of $59.4 million).

82

No. 20-30382
c/w No. 20-30379

under United States federal law by United States servicemen and their families?

The cases before us present no due process problems. Plaintiffs properly brought suit pursuant to Rule 4(k)(2). NYK has no substantive due process right to be immune from suit here. And even if it did, none of its supposed liberty interests have actually been infringed. The Fifth Amendment's Due Process Clause poses no obstacle, so these suits should proceed.[40]

## IV.

The tail should not wag the dog any more than the bow should turn the ship. While the anticipated repercussions of a constitutional ruling should not drive the ultimate determination on the merits, it is nonetheless worth calling attention to the severe and anomalous consequences of today's majority holding. First, it will render most of Rule 4(k)(2)'s intended

---

[40] NYK has not alleged any other due process issues with these cases, and nor could it: The applicable Federal Rules of Civil Procedure are in no way arbitrary or calculated to frustrate notice. Rule 4(k)(2) reasonably addresses the problem that would arise when a plaintiff has federal law claims against a "defendant [who] is not subject to jurisdiction in any state's courts of general jurisdiction." In such a case, it would be absurd if United States *federal* law claims (brought by United States servicemen, no less) could not be heard in United States *federal* court, simply because no individual *state*'s courts had jurisdiction pursuant to *state* long-arm statutes or in keeping with the strictures of the Fourteenth Amendment (which apply to the *states*). *See* Fed. R. Civ. P. 4(k)(1)(A). Rule 4(k)(2) solves the problem by specifying that "serving a summons [per Rule 4(f)] or filing a waiver of service [per Rule 4(d)] establishes [a federal district court's] personal jurisdiction over a defendant" in such a case. In this case, no state had jurisdiction to hear the federal law claims of the plaintiff servicemen and their bereaved families. So, they filed their complaints in federal court, and they successfully obtained waivers of service from NYK in Tokyo. NYK received ample notice of the pending lawsuits. And evidently, this multinational corporate defendant had no more trouble getting a fair hearing here in federal court as a defendant than it has had prosecuting dozens of civil cases as a plaintiff in federal court.

applications unconstitutional, thereby reducing the statutorily authorized rule[41] to a virtual nullity.[42]  Second, it will similarly choke Rule 4(k)(1)(C), which "establishes personal jurisdiction over a defendant" by "[s]erving a summons or filing a waiver of service . . . when authorized by a federal statute."  As a result, American victims of terrorist attacks abroad and Cuban refugees who have lost everything to Communist confiscation will not be able, meaningfully, to avail themselves of remedial federal legislation.  And finally, today's holding also brings about a couple of anomalies: (1) *civil* foreign defendants now have more due process rights than *criminal* foreign defendants; and (2) *foreign* corporations now receive more due process protection than *domestic* corporations under our own Constitution.

## A.

Today's majority holding guts Rule 4(k)(2) of virtually all of its intended applications.  Instead of examining the Fifth Amendment Due Process Clause's original meaning, the *en banc* court simply rides the wake of inapposite Supreme Court Fourteenth Amendment jurisprudence. Promulgated in 1993 in response to the Supreme Court's decision in *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97 (1987), Rule 4(k)(2) was designed to authorize federal courts to exercise personal jurisdiction over

---

[41] Rule 4(k) was adopted under the Judicial Improvements and Access to Justice Act of 1988.  *See* Pub. L. No. 100-702, § 401, 102 Stat. 4642, 4648 (codified as amended at 28 U.S.C. § 2072).

[42] *Cf. Sveen v. Melin*, 138 S. Ct. 1815, 1831 (2018) (Gorsuch, J., dissenting) ("The judicial power to declare a law unconstitutional should never be lightly invoked."); *Lamar Outdoor Advert. v. Miss. St. Tax Comm'n*, 701 F.2d 314, 333 (5th Cir. 1983) ("We recognize that our power to strike down state laws as unconstitutional is strong medicine; we do not administer it lightly."); *El Paso & Ne. Ry. Co. v. Gutierrez*, 215 U.S. 87, 96 (1909) ("It is hardly necessary to repeat what this court has often affirmed, that an act of Congress is not to be declared invalid except for reasons so clear and satisfactory as to leave no doubt of its unconstitutionality.").

No. 20-30382
c/w No. 20-30379

federal claims that could not otherwise be heard in any state court to the fullest extent consistent with the Constitution. If the Fifth Amendment mirrors the Fourteenth Amendment, Rule (4)(k)(2)'s range of applications nearly vanishes.

Consider first general jurisdiction. The Supreme Court has said that the Fourteenth Amendment only allows the exercise of general personal jurisdiction over a foreign defendant who is "essentially at home" in the United States—an "exceptional case" very seldom encountered in real life. *Daimler*, 571 U.S. at 139 & n.19 (citing *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 447–48 (1952)). Rarely is a foreign-domiciled corporation deemed "at home" in the United States. Yet these foreign-domiciled corporations are precisely the prospective defendants to whom Rule 4(k)(2) was thought to apply.

The majority opinion suggests *specific* jurisdiction would remain available under Rule 4(k)(2). *Ante* at 22–23 & n.27. Maybe so. A few occasional applications of the Rule could conceivably arise, for instance, when claims arise in states with long-arm statutes that stop short of the constitutional maximum,[43] or when cyber-injuries affect the United States as

---

[43] Specifically, Rule 4(k)(2) could apply where: (1) a defendant has minimum contacts with a forum state that has a long-arm statute that stops short of the constitutional limit; (2) the defendant's contacts fall between the constitutional and statutory lines; and (3) no other state forum is available.

In our circuit, such applications of the Rule could arguably only arise out of Mississippi, which has a somewhat limited long-arm statute. *Compare* Miss. Stat. § 13-3-57 (2003) (Mississippi long-arm statute); *Gross v. Chevrolet Country, Inc.*, 655 So. 2d 873, 877–78 (Miss. 1995) (analyzing statutory factors to determine that a nonresident corporation was "not amenable to jurisdiction in Mississippi pursuant to [the state] long arm statute"), *with* Tex. Civ. Prac. & Rem. Code § 17.042 (2001) (Texas long-arm statute); *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 66 (Tex. 2016) ("The Texas long arm statute provides for personal jurisdiction that extends to the limits of the United States Constitution, and so federal due process requirements shape the contours of Texas courts'

a whole and no state in particular. But, as with general jurisdiction, it would still be the "exceptional case."

Because the majority opinion lashes together the Fifth and Fourteenth Amendment personal jurisdiction standards without distinction, Fourteenth Amendment limitations on *specific* jurisdiction now apply likewise to Fifth Amendment cases. And the Supreme Court has said that for courts to have specific jurisdiction to entertain certain claims, the Fourteenth Amendment requires the underlying injury to have occurred, at least in part, in the forum. *Bristol-Myers*, 137 S. Ct. at 1781–82 ("In order for a court to exercise specific jurisdiction over a claim, there must be an 'affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State.'" (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011))); *cf. Ford Motor Co.*, 141 S. Ct. at 1028, 1030–31 (upholding specific jurisdiction in states where Ford "systematically served a market . . . for the very vehicles that the plaintiffs allege malfunctioned and injured them in those States").

Applying *Bristol-Myers*'s forum-injury requirement would squelch federal courts' exercise of *specific* jurisdiction over American injuries sustained abroad, just as *Daimler*'s "at home" test would squash federal courts' exercise of *general* jurisdiction over foreign corporate defendants doing substantial, considerable business in the United States. As a result, Rule 4(k)(2)—a congressionally authorized rule—will indeed be rendered virtually a nullity—and this as a result of casual reliance on inapposite Supreme Court precedent. *Cf. United States v. Morrison*, 529 U.S. 598, 607 (2000) ("Due respect for the decisions of a coordinate branch of

jurisdictional reach."), *and* La. R.S. § 13:3201 (Louisiana long-arm statute); *Bridges v. Autozone Props., Inc.*, 900 So. 2d 784, 803 (La. 2005) ("[T]he limits of Louisiana's long-arm statute [are] coextensive with the limits of constitutional Due Process.").

Government demands that we invalidate a congressional enactment *only upon a plain showing* that Congress has exceeded its constitutional bounds." (emphasis added)).

## B.

Today's decision also threatens to sink our ability to hear many cases sounding in admiralty—an area of law in which we have long been empowered to adjudicate claims involving far-flung parties aboard vessels in far-flung places on the seven seas. Federal courts hold a unique role in admiralty to define causes of action and to hear cases arising in the world's common areas—the high seas—as the Supreme Court has made clear. *See Fitzgerald v. U.S. Lines Co.*, 374 U.S. 16, 20–21 (1963) ("Article III of the Constitution vested in the federal courts jurisdiction over admiralty and maritime cases .... This Court has long recognized its power and responsibility in this area and has exercised that power where necessary to do so."); *The Belgenland*, 114 U.S. 355, 368–69 (1885) (noting that there is "no good reason" why a party injured on the high seas "should ever be denied justice in our courts," even when both parties are "foreigners"); *cf. The Dutra Group v. Batterton*, 139 S. Ct. 2275, 2278 (2019) (discussing the history of federal courts "enlarged and liberal" maritime and admiralty jurisprudence (quoting *Brown v. Lull*, 4 F. Cas. 407, 409 (C.C.D. Mass. 1836) (No. 2,018) (Story, J.))).

We and our sister circuits regularly hear cases involving diverse international parties arising out of events occurring on waters far away. *See, e.g.*, *Liaw Su Teng v. Skaarup Shipping Corp.*, 743 F.2d 1140, 1142–43, 1145–46 (5th Cir. 1984) (applying *The Belgenland* to "retain jurisdiction" over an admiralty suit involving Taiwanese and Hong Kong sailors on a Liberian ship that crashed with a Greek ship off the coast of Algeria), *overruled on other grounds by In re Air Crash Disaster Near New Orleans, La. on July 9, 1982*, 821

F.2d 1147 (5th Cir. 1987); *Fitzgerald v. Texaco, Inc.*, 521 F.2d 448, 450–54 (2d Cir. 1975) (mentioning no jurisdictional issue in a lawsuit between German and Panamanian interests as to vessels shipwrecked in the English channel); *id.* at 455 (Oakes, J., dissenting) (noting that because the court was "dealing . . . with a transitory action, a collision occurring on the high seas, albeit in the English Channel, between vessels of foreign registry, with foreign nationals as plaintiffs . . . . we have jurisdiction"); *Gkiafis v. S.S. Yiosonas*, 387 F.2d 460, 462 (4th Cir. 1967) ("A suit in admiralty between foreigners is within the jurisdiction of the District Courts of the United States. Not only does jurisdiction exist, but it will be exercised 'unless special circumstances exist to show that justice would be better subserved by declining it.'" (quoting *The Belgenland*, 114 U.S. at 367)).

Although the present case involves a collision occurring in Japanese territorial waters, the majority holding could impact future cases arising on the briny deep far from any other sovereign. Because the *en banc* majority declines to plumb the Fifth Amendment's original public meaning, we are now stuck with an atextual, ahistorical rule that might constrict our ability even to hear cases that arise beyond any nation's territorial power. Suppose, for instance, the collision that spawned this case took place as the ships were passing Hawaii—but just outside of United States territorial waters. Even though the claims would have arisen on the high seas, and indeed, much closer to the United States than Japan, the holding of the majority opinion would still require the plaintiffs to go all the way to Japan to pursue their claims because NYK is not "at home" in the United States. This should give us pause.

## C.

This may seem like an academic debate about the quirks of civil procedure. But consider what this means in the real world. As Judge

No. 20-30382
c/w No. 20-30379

Higginson rightly observes, today's holding will "redirect United States citizen-plaintiffs—asserting United States federal law claims and invoking United States federal law service of process—offshore, often to countries with far less developed legal systems than Japan." *Post* at 99. In significantly curtailing plaintiffs' recourse to our nation's federal courts, the majority's decision effectively neuters Congress of its ability to use our own legal system and its well-established rule of law to help right the most grievous wrongs committed against Americans abroad.

Look no further than the *amicus* brief submitted by victims of the Castro regime. In response to Castro's terrorist acts, Congress passed and President Clinton signed the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996. Pub. L. No. 104-114, 110 Stat. 785 (codified at 22 U.S.C. § 6021, *et seq.*) [hereinafter Helms–Burton Act, as it is commonly known]. The Helms–Burton Act sought to impose international sanctions on the Castro regime. Specifically, under Title III of the Act, Congress provided that "[t]o deter trafficking in wrongfully confiscated property, United States nationals who were the victims of [such] confiscations should be endowed with a judicial remedy in the courts of the United States that would deny traffickers any profits from economically exploiting Castro's wrongful seizures." 22 U.S.C. § 6081(11); *see also id.* § 6082(a)(1)(A).

Despite Congress providing this remedy, every President from 1996 to 2019 lawfully suspended that private right of action. *See id.* § 6085(c) (giving the President such authority). But in 2019, President Trump ended the suspension of Title III, which enabled suits to be filed against those trafficking in this stolen property. *See Glen v. Am. Airlines, Inc.*, 7 F.4th 331, 333 (5th Cir. 2021). As a result, the victims of the Castro regime's pervasive seizure of Cuban assets can seek relief from those foreign actors that reaped profits from the victims' stolen property abroad. *See, e.g., Herederos de Roberto Gomez Cabrera, LLC v. Teck Res. Ltd.*, 535 F. Supp. 3d 1299, 1304–07

No. 20-30382
c/w No. 20-30379

(S.D. Fla. 2021), *appeal filed*, No. 21-12834 (11th Cir. Aug. 18, 2021) (seeking relief under the Helms–Burton Act and presently appealing dismissal for lack of personal jurisdiction).

However, it is an empty gesture here in this circuit. That is because (according to the majority opinion) the Fifth Amendment's Due Process Clause bars Congress from authorizing federal courts to exercise personal jurisdiction unless either (1) the foreign actor is "essentially at home" here, or (2) the foreign actor's trafficking of the stolen property has substantially occurred in the United States. By constitutionally cabining Rule 4(k)(2), and also necessarily limiting Rule 4(k)(1)(C), the victims of the Castro regime are again left empty-handed.

This is not a one-off problem confined to the Helms–Burton Act. Take the Antiterrorism Act, which provided victims of terrorism abroad a private right of action in our federal courts. 18 U.S.C. § 2333(a). Now, so long as foreign sponsors of terrorism target American interests abroad, federal district courts cannot exercise personal jurisdiction over victims' claims, despite Congress's express statutory permission (as recognized by Rule 4(k)(1)(C))—this, supposedly because of the Fifth Amendment's Due Process Clause. *See, e.g.*, Aaron D. Simowitz, *The Private Law of Terror*, 126 Penn St. L. Rev. 159, 192–93 (2021); *see also* Brief of Intervenor–Appellant United States at 35–40, *Fuld v. Palestinian Liberation Org.* (2d Cir. June 24, 2022) (Nos. 22-76, 22-496) (noting that "Congress . . . has enacted numerous laws, including the ATA, combating acts of international terrorism outside the United States that affect U.S. persons and interests" by vesting federal courts with adjudicative authority, and arguing that the Fifth Amendment interposes no obstacle to federal court personal jurisdiction in such cases).

No. 20-30382
c/w No. 20-30379

Consider also the practical effect of the majority opinion's holding on the Executive. As *amici* civil procedure professors point out, if the United States sued foreign defendants in our federal courts to recover civil damages for injuries sustained abroad (like, for instance, a Navy vessel wrecked in foreign waters), the holding in this case equally precludes us from exercising personal jurisdiction over foreign defendants if they are not "essentially at home" in the United States. Thus, under the majority opinion's reasoning, the federal government is powerless to vindicate American interests and to recoup damages inflicted (ultimately) on the American taxpayer in our own federal courts because the Fifth Amendment's Due Process Clause protects a foreign defendant from being haled into our courts.[44] The harsh absurdity of this conclusion should surely make us think twice.

## D.

Not only does the majority opinion virtually erase a Federal Rule of Civil Procedure and squash the real-world ability of our coordinate branches to pursue legitimate objectives through and in federal court, but, as suggested earlier, *see supra* sections II.C.2–3, this *en banc* holding also creates at least two legal anomalies. First, we now privilege *civil* foreign defendants with a due process right not shared by foreign *criminal* defendants. And second, we privilege foreign corporations over comparable corporations domiciled here: the former can reap the rewards of doing business here without the legal

---

[44] *Cf. The Belgenland*, 114 U.S. at 368–69 ("[W]here the parties are not only foreigners, but belong to different nations, and the injury . . . takes place on the high seas, there seems to be no good reason why the party injured, or doing the service, should ever be denied justice in our courts."). If an injured *foreign* party suing another *foreigner* "should [n]ever be denied justice in our courts," *a fortiori*, neither should an injured United States citizen or the United States itself.

No. 20-30382
c/w No. 20-30379

consequences to which our own corporations must submit. Both anomalies suggest that the *en banc* court has lost its bearings.

1.

"The due process requirements in a *civil* case where only property interests are at stake are, of course, *much less stringent* than in a *criminal* case involving life and liberty interests." *Fehlhaber v. Fehlhaber*, 681 F.2d 1015, 1027 (5th Cir. 1982) (emphases added). These heightened stakes account for the many differences between civil and criminal procedure: Criminal defendants, for instance, must be proven guilty beyond a reasonable doubt, while civil defendants ordinarily need only be found liable by a preponderance of the evidence. *See In re Winship*, 397 U.S. 358, 364 (1970). Criminal defendants are entitled to receive exculpatory evidence from the prosecution without asking for it; civil defendants proactively must use discovery to get the evidence that they need. *See Brady v. Maryland*, 373 U.S. 83, 86 (1963). The list goes on.

Today's majority opinion produces a troubling inversion of this general rule. Along with our sister circuits, we have previously held that federal courts *may* render binding judgments against foreigners in criminal cases, regardless of the defendants' territorial contacts with the United States, so long as the defendants' alleged criminal conduct affected the United States or U.S. nationals abroad.[45] *See, e.g.*, *Rojas*, 812 F.3d at 393 ("In

---

[45] Of course, the federal courts' ability to render binding criminal judgments against foreigners also depends upon the existence of a law of Congress enacted pursuant to one of Congress's constitutionally enumerated powers. *See, e.g.*, *United States v. Davila-Mendoza*, 972 F.3d 1264, 1268–78 (11th Cir. 2020) (vacating convictions of three foreign nationals for crimes committed in a foreign nation's territorial waters because the Maritime Drug Law Enforcement Act exceeded Congress's enumerated foreign commerce power). But this does not imply that other enumerated powers do not allow Congress to authorize

the context of non-U.S. citizens, due process requires the government to demonstrate that there exists a sufficient nexus between the conduct condemned and the United States such that application of the statute would not be arbitrary or fundamentally unfair to the defendant." (quoting *Lawrence*, 727 F.3d at 396 (internal quotation marks omitted))); *Murillo*, 826 F.3d at 157 (finding no Fifth Amendment obstacle to prosecuting a foreign defendant in the United States "if his 'actions affected significant American interests'—even if the defendant did not mean to affect those interests" (quoting *Brehm*, 691 F.3d at 552)).

But now that the Fourteenth Amendment "at home" test applies in the Fifth Amendment context, foreign corporate civil defendants will be "immunize[d]" from suit here. *Ante* at 24. Unlike foreign criminal defendants, whom federal courts can sentence to death or prison even if they have never set foot in the United States or never even intended to affect the United States, civil corporate defendants will be insulated against federal court personal jurisdiction in cases involving mere money damages if they can simply show that despite doing even extensive business in the United States, they are not "essentially at home" here. *See Waldman*, 835 F.3d at 340 (candidly acknowledging the difference in standards applicable to criminal and civil cases after importing *Daimler*'s "at home" test). This cannot be right.

### 2.

Yet another anomaly lies in our affording significant due process rights to a foreign corporation. The American Constitution exists primarily to secure the rights of Americans. The Supreme Court has held that foreign

---

personal jurisdiction in federal courts over foreign actors for foreign conduct (whether civil or criminal) affecting United States interests.

corporations are entitled to less constitutional protection than citizens, if at all—especially when they remain abroad. *See Agency for Int'l Dev.*, 140 S. Ct. at 2086–87 (foreign corporation has no First Amendment rights, despite having domestic affiliates); *see also Douglass*, 996 F.3d at 295; *cf. Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1981–83 (2020) (alien within U.S. territory not entitled to full range of due process rights); *Verdugo-Urquidez*, 494 U.S. at 264–75 (alien abroad not protected by the Fourth Amendment); *Eisentrager*, 339 U.S. at 784 (aliens abroad not protected by the Fifth Amendment).

Here, NYK would like to have its cake and eat it too. This foreign corporation has frequently reaped the benefits of the American legal system—it has sued nearly *eighty* times in federal district courts in under thirty years—but, having *been* sued, NYK suddenly cries foul. To claim the protection of Fourteenth Amendment due process case law, NYK insists that it is not "at home" in the United States and, therefore, cannot be haled into U.S. court from its residence abroad. In other words, the corporation demands the right to stay home, abroad. But, in asserting that it *has* due process rights under the U.S. Constitution in the first place, NYK acknowledges its presence in the United States and its desire to receive the legal benefits of being "at home" here. This runs up against the principle of noncontradiction: NYK cannot both be "at home" here and not. Something is not quite right.

\* \* \*

All of these troubling consequences and anomalies are big red flags signaling that we have headed down the wrong path. We are better off looking to what the Fifth Amendment's Due Process Clause meant when it was adopted—not what the Supreme Court has said the Fourteenth Amendment's Due Process Clause means in different contexts. Adhering to

No. 20-30382
c/w No. 20-30379

the Fifth Amendment's original meaning steers us clear of these problematic results.

## V.

The Supreme Court has never interpreted the Fifth Amendment's Due Process Clause with respect to personal jurisdiction. The Court has expressly left the question open. It is our duty to offer an answer. But the majority opinion simply copies and pastes inapplicable modern Supreme Court case law expounding on the Fourteenth Amendment, as if the Fourteenth Amendment imbues the Fifth Amendment with new meaning. In my view, we should not put new wine in an old wineskin. There is no substitute for a diligent inquiry into the original public meaning of the Fifth Amendment's Due Process Clause. As originally understood and applied (or rather, *not* applied), the Fifth Amendment imposed no significant restriction on Congress's ability to authorize service of process abroad, and hence, to expand federal courts' personal jurisdiction.

## VI.

I would hold that the district court in this case had personal jurisdiction over NYK and remand for further proceedings. Therefore, I respectfully dissent.

No. 20-30382
c/w No. 20-30379

STEPHEN A. HIGGINSON, *Circuit Judge*, dissenting:

I agree with the dissent's conclusion that the district court had adjudicative jurisdiction over NYK. I write separately to highlight that by importing Fourteenth Amendment constraints on personal jurisdiction, born out of federalism concerns, into process due to foreign corporations in global disputes, where those concerns don't exist, our court makes several mistakes.

First, the Supreme Court has been explicit it has not done this cross-incorporation. *See Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 137 S. Ct. 1773, 1783-84 (2017) ("[S]ince our decision concerns the due process limits on the exercise of specific jurisdiction by a State, we leave open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court."); *see also Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 102 n.5 (1987); *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 885 (2011) (plurality opinion); *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113 n.* (1987) (opinion of O'Connor, J.).

Second, as valiantly explicated in the principal dissent, discerning historical purpose to justify cross-incorporation of the 1868 meaning of "due process" in the Fourteenth Amendment, protecting all persons from state government depredation, back a century to 1791 and what the framers of the Fifth Amendment meant protecting "person[s]" from federal government overreach, all in effort to divine what process is constitutionally due foreign companies in 21st century global disputes, is an originalist mismatch that should call to mind Justice Jackson's reminder three-quarters of a century ago that "[j]ust what our forefathers did envision, or would have envisioned had they foreseen modern conditions, must be divined from materials almost as enigmatic as the dreams Joseph was called upon to interpret for Pharaoh." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 634 (1952) (Jackson, J., concurring). Indeed, academics have regretted that "'existing records offer

96

No. 20-30382
c/w No. 20-30379

no evidence of any debate on the due process clause in the Congress . . . or in the state legislatures that ratified' the Bill of Rights." Chimène I. Keitner, *Personal Jurisdiction and Fifth Amendment Due Process Revisited*, *in* THE RESTATEMENT AND BEYOND: THE PAST, PRESENT, AND FUTURE OF U.S. FOREIGN RELATIONS LAW 231, 236 n.20 (Paul B. Stephan & Sarah H. Cleveland eds., 2020) (alteration in original) (citing scholarship).[1]

Third, as the principal dissent and *amici* civil procedure scholars, not to mention practicing lawyers, observe, cross-incorporation has far-reaching, real-world implications.[2] Yet by importing the recently narrowed "place of business" and "at home" Fourteenth Amendment requirement, which assigns cases to courts inside the United States, into a Fifth Amendment constitutional rule against access-to-justice in *any* United States court for ever-increasing transnational litigation, what we do is embroider five words written to *enhance* liberty in 1791 to send United States plaintiffs overseas in for hope of justice.[3] *See* Pamela K. Bookman, *Toward the Fifth Restatement of*

---

[1] My skepticism put to one side, I applaud the principal dissent for its consistency of constitutional effort.

[2] *See, e.g.*, Brief of *Amicus Curiae* for Civil Procedure Law Professors, at 3-4 ("If, as the district court held, the Due Process Clause applicable to state courts applies in equal measure to the federal courts, then Rule 4(k)(2) becomes useless. Indeed, because the negligence that plaintiffs allege in this case also seriously damages the Navy ship on which they were serving, that rationale would foreclose a damages suit by the United States Government from being heard in any federal court in the United States. Congress did not intend such an unjust result, and the Constitution does not require it.").

[3] It is unsurprising that corporations will calibrate knowledgeably around jurisdictional leaps like ours today. *See, e.g.*, Catherine A. Spicer et al., *Home Is Where You're Incorporated: The US Supreme Court Limits Forum Shopping*, ASSOCIATION OF CORPORATE COUNSEL DOCKET, (Dec. 18, 2020), https://docket.acc.com/home-where-youre-incorporated-us-supreme-court-limits-forum-shopping ("Some businesses considering this question may prefer to eliminate the possibility of being subject to general personal jurisdiction in the United States altogether. A multinational company that is incorporated under the laws of another nation and with its principal headquarters beyond

No. 20-30382
c/w No. 20-30379

*U.S. Foreign Relations Law: The Future of Adjudicative Jurisdiction under Public International Law*, *in* THE RESTATEMENT AND BEYOND, *supra*, at 335, 341 (describing "litigation isolationism" trend in doctrine—of course without anticipating our leap today cross-incorporating *Daimler*'s inapt federalism-based constriction to curtail application of federal law to multinational corporate defendants altogether); *see also* Pamela K. Bookman, *Litigation Isolationism*, 67 STAN. L. REV. 1081 (2015); Pamela K. Bookman, *Doubling Down on Litigation Isolationism*, 110 AJIL UNBOUND 57 (2016). When a defendant is a foreign corporation, even doing continuous and immense commerce in the United States, if it stays purposively not "at home" in any state, then its actions that infringe federal law across the globe yet without specific jurisdiction case-link, cannot be heard.  *See also* Aaron D. Simowitz, *Legislating Transnational Jurisdiction*, 57 VA. J. INT'L L. 325, 327-28 (2018) (describing how the United States has become one of the most "jurisdictionally stingy" countries in the world—again, of course, without anticipating our further leap).

Fourth, cross-incorporation of bedrock fair notice due to "persons" in *interstate* cases, a federalism-centered and court-preserving inquiry, to fairness owed overseas corporations in *international* cases, I think overlooks the Supreme Court's distinct, foreign powers and sovereign state-centered comity approach confirmed in *Daimler AG v. Bauman* itself. 571 U.S. 117, 140-42 (2014). That inquiry, broadly described, resembles Fourteenth Amendment doctrinal constriction in outcome—redirecting litigation among courts—but, to my eye, is based neither on international law nor extrapolation from the Fifth Amendment. Instead, the Court assesses litigation in the international setting with use of the canon of statutory

US borders will be "at home" nowhere in the United States. Claims against such a company could therefore be brought only pursuant to a court's specific jurisdiction.").

interpretation known as the presumption against extraterritoriality, premised itself on the separation of powers truth that our political branches possess foreign relations powers hence courts should not apply United States statutes prescriptively when doing so might infringe the sovereignty of foreign nations unless Congress has made that intent clear. *See RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325 (2016); *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010); *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244 (1991).

Finally, the distinction that the Supreme Court has preserved, which we erase with cross-incorporation, is delineation that scholars, not only of constitutional law, *supra*, but also of foreign relations law, have discussed for years. *See, e.g.* THE RESTATEMENT AND BEYOND, *supra*. Much of this discussion is at the heart of The Restatement of the Foreign Relations Law of the United States, *see* FOURTH RESTATEMENT OF FOREIGN RELATIONS LAW §§ 401, 422, unacknowledged by us too, even as we redirect United States citizen-plaintiffs—asserting United States federal law claims and invoking United States federal law service of process—offshore, often to countries with far less developed legal systems than Japan.[4]

With the above in mind, I am confident that when the Supreme Court revisits the distinction it carefully has preserved,  it will take cognizance of all

---

[4]At minimum, in this area of international comity and sensitivity, it would be important to know the views of the Solicitor General, or those of the Legal Advisor to the Department of State, as to what nexus is sufficient for federal courts to assert adjudicative jurisdiction without entangling our legal system with those of other nations. Though the Acting Solicitor General declined to file a brief in this case, in other cases, the United States has asked for special solicitude for its own sovereignty on the international stage. *See, e.g.*, Brief of the United States as *Amicus Curiae* at 32, *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017 (2021) (Nos. 19-368, 19-369), 2020 WL 1478612, at *32 ("In addition, the United States' constitutional powers and special competence in matters of foreign affairs and international commerce, in contrast to the limited and geographically cabined sovereignty of each of the several States, would permit the exercise of federal judicial power in ways that have no analogue at the state level.").

pertinent scholarship, constitutional and foreign relations law. And I am confident it will consider the real world consequences the *amici* civil procedure professors highlight to urge, based both on Supreme Court precedent and also Congress's Rule 4(k)(2), that, in cases arising under federal law, the Fifth Amendment allows more flexibility than the Fourteenth Amendment, permitting "jurisdiction over a non-US defendant that does 'systematic and continuous' business in the United States." Here, that test is certainly met given NYK's extensive business and frequent litigation in the United States, hence I would find jurisdiction.

No. 20-30382
c/w No. 20-30379

ANDREW S. OLDHAM, *Circuit Judge*, dissenting.

This case should be resolved by two propositions. First, the Supreme Court has never answered—in fact, it has expressly left "open"—"the question whether the Fifth Amendment imposes the same restrictions [as the Fourteenth] on the exercise of personal jurisdiction by a federal court." *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 137 S. Ct. 1773, 1784 (2017); *see also J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 885 (2011) (plurality op.); *Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 102 n.5 (1987). Second, as originally understood, the Fifth Amendment did not impose any limits on the personal jurisdiction of the federal courts. Instead, it was up to Congress to impose such limits by statute. *See, e.g.*, Stephen E. Sachs, *The Unlimited Jurisdiction of the Federal Courts*, 106 VA. L. REV. 1703, 1717–27 (2020); *Picquet v. Swan*, 19 F. Cas. 609, 615 (C.C.D. Mass. 1828) (No. 11,134) (Story, J.); *see also ante*, at 54–61 (Elrod, J., dissenting). That should've been the end of the case.

With all respect for my esteemed colleagues, I do not understand how this case implicates (1) "linguistic drift." *See ante*, at 43–44, 63 (Elrod, J., dissenting). Nor do I see how the Supreme Court's (2) "longstanding incorporation jurisprudence" or (3) unenumerated-rights precedents prevent us from adopting the originalist answer here. *See ante*, at 31–32 (Ho, J., concurring).

1.

Start with linguistic drift. The theory appears to be that "due process of law" could've had one original public meaning when the People ratified the Fifth Amendment in 1791, and it could've "drifted" to some different original public meaning in 1868 when the People ratified the Fourteenth Amendment. *See ante*, at 43–44, 63 (Elrod, J., dissenting). Maybe it did. Maybe it didn't. All I know is that "linguistic drift" is irrelevant here.

101

No. 20-30382
c/w No. 20-30379

The Supreme Court has confessed that its Fourteenth Amendment personal jurisdiction precedents do not rest on original public meaning. *See Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1036–39 (2021) (Gorsuch, J., concurring in the judgment); *id.* at 1032 (Alito, J., concurring in the judgment) (agreeing that "there are grounds for questioning the standard that the Court adopted in *International Shoe*" as an original matter); *id.* at 1025 n.2 (majority op.) (effectively conceding as much). With no originalist endpoint, there's nothing for the Fifth Amendment's original public meaning to "drift" to.

And it's particularly odd to inject into this case a theory of *reverse* drift. I do not understand how or why we'd take an *un*originalist interpretation of the Fourteenth Amendment, pull it back in time to 1791, and use it to blind ourselves to an *originalist* interpretation of the Fifth Amendment. *Ante*, at 32–33 (Ho, J., concurring). I am unaware of any case from any court that obligates us to do that—especially to answer a question that the Supreme Court has insisted is "open." *Bristol-Myers*, 137 S. Ct. at 1784.

2.

Next, incorporation. Here, the theory appears to be that incorporation doctrine obligates us to apply the same body of law to the federal and state governments. So, the theory goes, we must use the same non-originalist understanding of "due process of law" for both the Fifth and Fourteenth Amendments. *See ante*, at 34–35 (Ho, J., concurring).

I recognize that Judge Ho invokes incorporation as yet another reason for rejecting the principal dissent's theory of "linguistic drift."[1] It

---

[1] I also take it that Judge Ho invites other arguments for applying different bodies of personal-jurisdiction law to the federal and state governments. *See ante*, at 35 (Ho, J., concurring). One argument is that *none* of the personal-jurisdiction limits—for *any* government, state or federal—come from the Fifth or Fourteenth Amendments. *See* Sachs,

nonetheless bears emphasis, however, that incorporation does nothing to prevent us from adopting an originalist understanding of the Fifth Amendment's Due Process Clause—even in the face of the Court's non-originalist understanding of the Fourteenth Amendment.

Any suggestion to the contrary conflates procedural and "substantive" due process. Personal jurisdiction—which is all that matters here—is a question of "*procedural* due process." *Phillips Petrol. Co. v. Shutts*, 472 U.S. 797, 812 (1985) (emphasis added). Incorporation, by contrast, is a question of "*substantive*" due process. *See Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2246 (2022). That is, the Court's incorporation precedents take the substantive constitutional rights guaranteed by the first eight amendments and then use the Fourteenth Amendment's Due Process Clause to make those rights applicable against the States. It's of course true that the *substantive* rights are the same, regardless of whether the plaintiff sues a federal or state defendant. *McDonald v. City of Chicago*, 561 U.S. 742, 765 (2010); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2137 (2022). But that says nothing about whether the same *procedural* restrictions apply to the federal and state governments. That's presumably why, again, the Court has insisted the Fifth Amendment *procedural* due process question is "open," *Bristol-Myers*, 137 S. Ct. at 1784, notwithstanding the *substantive* rights guaranteed by incorporation doctrine.[2]

---

*supra*, at 1722–24. They instead come from the common law, which obviously could place different limits on the reach of the federal and state sovereigns.

[2] It's no answer to say that the Supreme Court first left open the Fifth Amendment procedural due process question before it started incorporating the Bill of Rights against the States. *See ante*, at 29 (Ho, J., concurring) ("But *French* [*v. Barber Asphalt Paving Co.*, 181 U.S. 324 (1901),] was issued before the Court embraced the doctrine of incorporation."). *Bristol-Myers* (2017), *McIntyre* (2011), and *Omni* (1987) were all decided long after. The Court was surely aware of its incorporation doctrine in 2017, 2011, and 1987.

No. 20-30382
c/w No. 20-30379

3.

Finally, a word about unenumerated rights. *Ante*, at 31 (Ho, J., concurring) (relying on *Gonzales v. Carhart*, 550 U.S. 124 (2007)). In *Carhart*, the Court upheld a federal-law abortion restriction without considering whether the Fifth and Fourteenth Amendments require different *substantive* frameworks for abortion. 550 U.S. at 132–68. From that, my esteemed colleague infers that both amendments must impose identical *procedural* frameworks for personal jurisdiction. *See ante*, at 31 (Ho, J., concurring).

That's a *non sequitur*. And it's easy to understand why no one swerved out of the way to address irrelevant procedural arguments while considering the invocation of an unenumerated "substantive" due process claim in 2007.

First, the Court did not purport to ground its preexisting abortion doctrine in originalism. *E.g.*, *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 847–49 (1992) (plurality op.); *see also Dobbs*, 142 S. Ct. at 2317–50 (dissenting op.) (not defending *Roe* or *Casey* on originalist grounds). So it's unsurprising that the *Carhart* litigants said nothing about the original public meaning of any part of the Constitution.

Second, and in any event, long before *Gonzales*, the Supreme Court held that the same substantive framework applies to unenumerated rights under both the Fifth and Fourteenth Amendments' Due Process Clauses. *See, e.g.*, *Reno v. Flores*, 507 U.S. 292, 301–03 (1993); *United States v. Salerno*, 481 U.S. 739, 746 (1987). That obviously mattered in *Gonzales*. And it obviously doesn't matter where, as here, no one invokes "substantive" due process. In short, "[t]he non-discussion of an irrelevant question in an unrelated case does not prevent us from reaching the right answer to a constitutional question that the Supreme Court has expressly left open." *Ante*, at 45 n.4 (Elrod, J., dissenting).